STATE OF NORTH CAROLINA v. WILLIAM HARBISON, JR.

No. 1

(Filed 11 November 1977)

1. **Constitutional Law § 60— reasonable opportunity to show systematic exclusion of blacks from jury**

A defendant must be allowed a reasonable time and opportunity to inquire
into and present evidence regarding the alleged systematic exclusion of
Negroes because of their race from serving on the grand or petit jury in his
case. Whether he was afforded reasonable time and opportunity must be
determined from the facts in each particular case.

2. **Constitutional Law § 60— denial of continuance—opportunity to show systematic exclusion from jury**

Defendant was not denied his constitutional right to a reasonable time and
opportunity to investigate the possibility of systematic exclusion of blacks
from the petit jury by the denial of his motion for continuance made on the
day defendant's case was called for trial where the only evidence urged in sup-
port of the motion was the fact that sixty prospective jurors were drawn from
the box and the thirty-two of them who reported for jury duty were all white;
defendant was represented by counsel at least four months before trial; the
names of the sixty prospective jurors were publicly known for fifty-five days
prior to the trial; and defense counsel was thus afforded a reasonable time and
opportunity prior to the trial to inquire into the race of each juror, the com-

State v. Harbison

position of the jury box, the procedures for drawing the jury, the race and number of jurors not summoned by the sheriff and the reason therefor, the race and number of jurors excused and the practices and procedures employed by the chief district judge when passing upon excuses.

**3. Criminal Law § 42.2— real evidence—identity and unchanged condition**

Objects offered as having played an actual, direct role in the incident giving rise to the trial are denoted "real evidence." In order to be admissible, such evidence must be identified as the same object involved in the incident and it must be shown that the object has undergone no material change in its condition since the incident.

**4. Criminal Law § 42.2— identity and unchanged condition of evidence—discretion of court**

The trial judge possesses and must exercise a sound discretion in determining the standard of certainty required to show that an object offered is the same as the object involved in the incident giving rise to the trial and that the object is in an unchanged condition.

**5. Criminal Law §§ 42.5, 42.6— exclusion of tire—failure to show identity and unchanged condition**

The trial court did not err in the exclusion of a tire, offered for the purpose of showing the location of bullet damage to the tire, on the ground that the identity and unchanged condition of the tire had not been established where officers who first examined the tire testified that such examination revealed no holes in the tire, and bullets were not discovered in the tire until reexamination of the tire three months after it had been released from police custody; furthermore, the State was not prohibited from objecting to admission of the tire because police officers—agents of the State—caused the breakdown in the chain of custody by releasing the tire to its owner where there was no evidence that officers knew the tire had been fired into at the time they released it from custody or that defendant's counsel had informed anyone the tire would be material to defendant's case.

**6. Homicide § 31.7— second degree murder—imposition of life imprisonment**

The trial judge did not act arbitrarily and capriciously in sentencing defendant to life imprisonment for second degree murder since the punishment is within statutory limits, G.S. 14-17, and is not inappropriate for the brutal, unprovoked murder disclosed by evidence which would have supported a verdict of first degree murder.

Justice EXUM dissenting.

DEFENDANT appeals from judgments of *Friday, J.*, 30 August 1976 Session, BURKE Superior Court.

Defendant was tried upon separate bills of indictment charging him with the first degree murder of Morris Hardy on 25 April 1976 and felonious assault upon Dannah Yvonne Franklin on the same date.

The State's evidence tends to show that defendant, a twenty-six-year-old black man, married and the father of two children, and Dannah Franklin, a twenty-year-old unmarried white woman, had known each other for three years, dated for about two years, quit dating in August 1975 but continued an occasional rendez-vous on a friendly basis. Because Miss Franklin's father objected to the relationship on account of the racial difference, they would meet by prearrangement at various secluded parking places along the road.

On 24 April 1976 Miss Franklin had been visiting Mrs. Rena Shade, a colored friend of hers. She arrived at the Shade home between 9 and 10 a.m. and remained until approximately midnight. Morris Hardy, a black man, came to the Shade home about 9:30 p.m. and remained until approximately midnight. This was the second time Miss Franklin had ever seen him. After watching television and talking until approximately midnight, Miss Franklin arose to leave and Morris Hardy asked her to take him home. They left together in her 1968 blue Buick Electra 225. As they proceeded westward on I-40 near Morganton, defendant drove up behind them in his 1975 white Oldsmobile Cutlass. Miss Franklin speeded up and attempted to elude him. Defendant followed the Franklin car for five miles from I-40 over rural paved roads and finally onto the Morningstar Road which is unpaved. When the Franklin car skidded into the ditch line on a stiff curve, defendant succeeded in passing it and stopped his vehicle partially blocking the road. He jumped out of his car with gun in hand and came back to the Franklin vehicle.

Miss Franklin described the events which followed in these words: "He didn't say anything. . . . He pointed it at the window. I started to go around his car, and the angle he pulled in front of me, I didn't know whether I could get past his car or not without going on up the embankment. He, as I started around his car rolling, he shot at the left front tire. He shot once, and then he slid his steps, and he shot twice. . . . I felt the tire going down. He then raised up and shot through the window. He was midways of the back end of his car, about three feet, maybe less when he shot. . . . I seen glass bursting, and it hit me in the face. I screamed. . . . Morris touched my left arm . . . I didn't hear the fourth shot. It hit me in the back of the head. . . . I went in the floor between Morris' legs. . . . I heard the fifth shot. I was pray-

ing. . . . I got up. Morris' arm was laying inside on the same side of his seat where he was sitting. I touched his arm. I heard him breathing real loud; and then he started groaning . . . and I heard him groan three times, or like he was drowning in his blood, or something, and I looked up. I didn't realize at the time that he must have died right there."

The State's evidence further tends to show that defendant got in his car and left the scene but returned after driving about a mile. He overtook Miss Franklin who was walking along the road looking for help. He picked her up and repeatedly said, "I didn't mean to do it." She asked him why he did it and he never did say. He drove Miss Franklin to the hospital after examining Morris Hardy and expressing the opinion that he was probably dead. He threw the murder weapon under the shrubbery at the hospital and it was later recovered by the officers.

Morris Hardy died from a gunshot wound in his back inflicted by a bullet fired from defendant's gun. Miss Franklin suffered a gunshot wound in the left eye resulting in its total destruction, necessitating removal.

Defendant testified as a witness in his own behalf. On and prior to 25 April 1976 he was employed as a correctional officer at Western Correctional Center in Morganton. He had known Dannah Franklin since 1972, had dated her on weekends for two years and thereafter continued to see her on an irregular basis until the date this incident happened. According to defendant's testimony, they had a good relationship, including a sexual relationship, and were quite compatible. They would call each other by telephone, arrange a meeting time and place, and if passing each other on the highway would blink their lights on and off, or blow the horn, and then meet at the agreed rendezvous spot. Sometimes, when Miss Franklin's father was not at home, defendant would pick her up at her home.

Shortly before midnight on the night in question, defendant recognized Dannah Franklin's car on the highway and she blinked her lights. Shortly thereafter the Franklin vehicle left I-40 westbound and defendant followed. He did not recognize the driver and could not tell who was in the car. The Franklin car was half a mile ahead of him as he continued to follow it. The Franklin car proceeded onto a dirt road where the driver accelerated rapidly,

throwing gravel, and defendant proceeded to follow it to find out why the car had not stopped. It was on the Morningstar Road when defendant finally succeeded in passing the car. He pulled in front of it and stopped about thirty feet away. Although his car was sitting in the middle of the road, it did not block the road. Defendant got out of his car, walked back toward the Franklin car, still unable to see who was in it, and heard a sudden acceleration. Thinking the driver was trying to run him down, he drew his revolver and fired twice at the left front tire. Demonstrating what happened, defendant said: "As I was walking back towards the car, the car accelerated, gravel started throwing proceeding towards me. At that point, I was scared for my life. I pulled my revolver. I fired twice at the two front tires. The car proceeded. It kept on coming. At that point, I was excited. I panicked. As the car kept coming, the third shot was fired. The third shot hit the window, the glass came out and hit me in the face, and at the same time I was pulling the fourth and fifth rounds."

Defendant further testified that the Franklin car ran off the road following the shooting and he got in his car and left. After driving about a mile he returned to the scene, took Miss Franklin to the hospital and called the sheriff's office to send an ambulance for Morris Hardy.

Defendant later told Detective Pruitt where to find the murder weapon. He testified that he kept the weapon loaded and on the console in his car at all times for "self-protection." He admitted that he followed the Franklin car five or six miles but asserted he was not chasing it. He denied getting out of the car with pistol drawn. He asserted that no ill will existed between him and the deceased Morris Hardy.

The jury convicted defendant of second degree murder of Morris Hardy and of an assault with a deadly weapon inflicting serious bodily injury on Dannah Franklin. The court imposed a life sentence for the murder and ten years for the felonious assault. He appealed the life sentence directly to the Supreme Court and we allowed a motion to by-pass the Court of Appeals in the assault case to the end that both cases receive initial appellate review in the same court.

*Rufus L. Edmisten, Attorney General; James E. Magner, Jr., Assistant Attorney General, for the State of North Carolina.*

*James C. Fuller, Jr. and John H. McMurray, attorneys for defendant appellant.*

HUSKINS, Justice.

When this case was called for trial on the morning of 30 August 1976 defendant moved for a continuance "to allow him reasonable opportunity and time to investigate and produce evidence, if such exists, in respect to the allegation of racial discrimination as to the petit jury as set forth in this motion." The unverified motion alleges that: (1) Thirty-two persons had been summoned and appeared for jury service, all of the white race and none of the Negro race; (2) more than 10 percent of the total population of Burke County are members of the Negro race; (3) lack of a reasonable number of members of the black race on the petit jury panel indicates systematic exclusion of members of the Negro race from jury service in Burke. County; and (4) the number of Negroes, if any, on the petit jury for this session of criminal court of Burke County was unknown to defendant until such jurors appeared in the courtroom for jury service.

The motion for continuance was denied. This constitutes defendant's first assignment of error.

The record shows that the names of sixty prospective jurors, corresponding to numbered decals drawn from the box, were taken from the master jury list and certified on 6 July 1976. Those names were available to the public generally and to defense counsel particularly from and after that date. On 30 August 1976, the date this case was called for trial, thirty-two of the sixty prospective jurors appeared in court ready to serve. All were members of the white race. Of the twenty-eight persons who did not report for jury duty, there is no evidence to show how many had died or moved away and were not summoned due to the sheriff's inability to locate them. There is no evidence of record to show how many rendered an excuse and were excused from jury duty by the chief district judge. There is nothing in the record to indicate how many, if any, were Negroes. The record does show that several members of the Negro race served on the jury during the previous week.

Defendant was represented by Attorney McMurray who was appointed on 27 April 1976 and also by Attorney Fuller whose firm had been privately retained on a date not shown by the record. Both are able, experienced attorneys, and Mr. McMurray has practiced law in Burke County for more than twenty years.

A motion for continuance is ordinarily addressed to the sound discretion of the trial court, and its ruling thereon is not subject to review absent abuse of discretion. *State v. Rigsbee*, 285 N.C. 708, 208 S.E. 2d 656 (1974). However, if the motion is based on a right guaranteed by the federal and state constitutions, it presents a question of law and the order of the court is reviewable. *State v. Baldwin*, 276 N.C. 690, 174 S.E. 2d 526 (1970). Defendant urges as error denial of his constitutional right to a reasonable time and opportunity to inquire into and present evidence regarding the alleged systematic exclusion of Negroes because of their race from serving on the petit jury in his case, citing *State v. Spencer*, 276 N.C. 535, 173 S.E. 2d 765 (1970), as authority. For reasons which follow, we find no merit in this contention.

[1] Decisions both state and federal hold that: (1) a defendant is not entitled to a proportionate number of his race on the jury which tries him, on the venire from which petit jurors are drawn, or even to have a representative of his race on the jury; (2) a defendant does have the constitutional right to be tried by a jury from which members of his own race have not been systematically and arbitrarily excluded; and (3) a defendant must be allowed a reasonable time and opportunity to inquire into and present evidence regarding the alleged systematic exclusion of Negroes because of their race from serving on the grand or petit jury in his case. Whether he was afforded a reasonable time and opportunity must be determined from the facts in each particular case. The authorities supporting these principles are cited and discussed in *State v. Spencer*, 276 N.C. 535, 173 S.E. 2d 765 (1970), and *State v. Cornell*, 281 N.C. 20, 187 S.E. 2d 768 (1972).

In his argument to the trial court in support of the motion for a continuance, defense counsel stated: "As I understand the cases, they provide that if this motion is made, even though it's made and the court is of the opinion that it's made purely for the purpose of a continuance, due process—*State v. Spencer*—holds, as I understand it, that the defendant is entitled to additional

time to make that investigation." The statement is erroneous; counsel is acting under a misapprehension of the law. Upon the facts disclosed by the record in this case, defendant had "a reasonable time and opportunity to inquire into and present evidence regarding the alleged systematic exclusion of Negroes" from serving on the petit jury in his case. Attorney McMurray was appointed on 27 April 1976. The sixty-member venire was drawn and made public on 6 July 1976. The case was duly calendared and thereafter called for trial on 30 August 1976. At 11:15 a.m. that morning defendant's motion for a continuance was filed. Admittedly, no investigation concerning the jury selection process had been undertaken and no evidence had been compiled, statistical or otherwise, tending to establish that blacks were under-represented in the jury box or on the jury, or that the selection procedure itself was not racially neutral, or that for a substantial period in the past relatively few Negroes had served on the juries of Burke County notwithstanding a substantial Negro population therein. The only evidence urged in support of the motion for continuance is the naked fact that sixty prospective jurors were drawn from the box and thirty-two of them, all white, appeared for jury duty. This fact alone does not even suggest a *systematic exclusion* of Negroes from the petit jury. "Even when there is 'striking' statistical evidence of disparity between the ratio of the races in population and jury service, or of the progressive elimination of potential Negro jurors through the selection process, the courts have considered such evidence, *standing alone,* insufficient to constitute a prima facie case of systematic discrimination. *See Alexander v. Louisiana,* 405 U.S. 625, 31 L.Ed. 2d 536, 92 S.Ct. 1221 (1972); *Swain v. Alabama,* 380 U.S. 202, 13 L.Ed. 2d 759, 85 S.Ct. 824 (1965)." *State v. Brower,* 289 N.C. 644, 653, 224 S.E. 2d 551, 558-59 (1976).

[2] It places no undue burden on defense counsel to require them to make investigations into jury composition and selection procedures prior to the time of trial, so long as the time between retention or appointment of counsel, the date the jury panel is drawn, and the date of trial is not so brief as to make such investigation impractical. *Compare State v. Inman,* 260 N.C. 311, 132 S.E. 2d 613 (1963); *State v. Perry,* 248 N.C. 334, 103 S.E. 2d 404 (1958). The jury list from which petit jurors are selected is prepared biennially, G.S. 9-2, is a public record, G.S. 9-4, and the

jury commissioners who possess knowledge of the sources from which the master jury list is compiled are local residents. G.S. 9-1. Persons who wish to be excused from jury duty must apply to the chief district judge, or another district judge designated by him, at a publicly announced time and place. G.S. 9-6(b). The record here shows that the names of the sixty jurors were publicly known for fifty-five days prior to the time the case was called for trial. This afforded defense counsel reasonable time and opportunity to inquire into the race of each juror, the composition of the jury box, the procedures for drawing the jury, the race and number of jurors not summoned by the sheriff and the reason therefor, the race and number of jurors excused, and the practices and procedures employed by the chief district judge when passing upon excuses. Failure to make such inquiry creates no constitutional right, in the name of Due Process, to additional time for such investigation simply because all jurors who reported for jury duty on the day defendant's case was called for trial were white. An automatic continuance for such inquiries, upon motion lodged for the first time when the case is called for trial, would fatally disrupt every session of court.

Under the facts of this case defendant has not been deprived of a reasonable opportunity to investigate the "possibility" of systematic exclusion of blacks from the petit jury. The lateness of the motion for a continuance suggests only a natural reluctance to go to trial and affords no basis to conclude that the trial judge abused his discretion or violated defendant's constitutional rights. The motion for continuance was properly denied. Defendant's first assignment of error is overruled.

On 25 April 1976 Officers Pruitt and Suttle examined the left front tire on the 1968 Buick in which decedent's body had been found. The examination revealed nothing unusual about the exterior of the tire except road damage and the fact that it was flat. Officers Pruitt and Bruce Allen removed the tire from the wheel, broke it down, examined the interior and noticed nothing unusual. The tire was then placed in the trunk of the Buick and, later that day, Officer Pruitt advised the person having custody of the car that the officers' inspection had been concluded and the car could be released to its owner John Franklin, Miss Franklin's father. At the time this inspection and release of the tire took place, defendant had made no statement that he had shot into the tire; rather,

he had told Officers Pruitt and Stan Jenkins that he had not been involved in any shooting.

On 31 July 1976 Officer Pruitt had occasion to examine a tire similar in make and appearance to the one he had examined on 25 April. On this examination he discovered two metal objects embedded in the back side of the tire. The tire was thereupon marked for identification and placed in the police evidence room where it remained until trial. Officer Pruitt was of the opinion that the tire he examined on 31 July was the same tire he had examined on 25 April. He testified, however, that his opinion was based on Miss Franklin's statement to him that it was the same tire and that he himself was unable to identify it as such. Neither Miss Franklin nor her father, the owner of the car, were examined concerning the identity of the tire or whether there had been any material change in its condition since the shooting on 25 April.

Defendant sought to offer the tire in evidence and, upon objection, it was excluded by the trial judge. This ruling constitutes defendant's second assignment of error.

[3]  Objects offered as having played an actual, direct role in the incident giving rise to the trial are denoted "real evidence." McCormick, Evidence § 212 (2d ed. 1972); 1 Stansbury's North Carolina Evidence § 117, n. 1 (Brandis rev. 1973). Such evidence must be identified as the same object involved in the incident in order to be admissible. *State v. Winford*, 279 N.C. 58, 181 S.E. 2d 423 (1971). It must also be shown that since the incident in which it was involved the object has undergone no material change in its condition. *See* McCormick, supra, § 212, p. 527. *See also Hunt v. Wooten*, 238 N.C. 42, 76 S.E. 2d 326 (1953). According to Professor Stansbury, when a tangible object is offered it must be first authenticated or identified, "and this can be done only by calling a witness, presenting the exhibit to him and asking him if he recognizes it and, if so, what it is." 1 Stansbury's North Carolina Evidence § 26 (Brandis rev. 1973).

[4]  There are no simple standards for determining whether an object sought to be offered in evidence has been sufficiently identified as being the same object involved in the incident giving rise to the trial and shown to have been unchanged in any material respect. "No specific rules have grown up about the authentica-

tion of chattels, chiefly because the variety of circumstances involved are so great that no specific rules would be suitable." 7 Wigmore, Evidence § 2129, at 569 (3d ed. 1940). Consequently, the trial judge possesses and must exercise a sound discretion in determining the standard of certainty required to show that the object offered is the same as the object involved in the incident giving rise to the trial and that the object is in an unchanged condition. McCormick, *supra* § 212, p. 527, at nn. 25-27. *See, e.g., Walker v. Firestone Tire and Rubber Co.*, 412 F. 2d 60 (2d Cir. 1969).

[5] In the present case defendant argues that the location of bullet damage in the tire would tend to show that he was in front of the vehicle at the time the tire was shot and thus tend to corroborate his testimony that he first fired at the vehicle as a defensive measure when Miss Franklin attempted to run him down. Even so, the record shows the trial court had before it the testimony of the officers who examined the tire on 25 April to the effect that their examination on that date revealed no holes in the tire. After the tire had been excluded, Officer Pruitt testified that even after the tire was broken down for examination of its interior on 25 April he observed nothing unusual about it except that it was flat. The bullets were not discovered until reexamination of the tire three months after it had been released from police custody. Under these circumstances Judge Friday quite properly insisted that defendant establish the identity and unchanged condition of the tire before admitting it into evidence. There was no testimony identifying the tire offered at trial. There was no evidence of unchanged condition. Rather, testimony at trial suggested that the examinations conducted on 25 April and 31 July (of what was alleged to have been the same tire) showed conflicting results. In our view Judge Friday properly excluded the tire and the testimony concerning examinations of it conducted on 31 July and thereafter.

Defendant further argues, however, that since the police officers — agents of the State — caused the breakdown in the chain of custody, the State should not be permitted to object to the introduction of the tire. It suffices to say that there is no evidence indicating the officers knew the tire had been fired into at the time they released it from custody. Nor is there any indication that defendant's counsel had informed anyone the tire would be

material to defendant's case. Neither bad faith nor negligence can be ascribed to the officers under such circumstances. Defendant's second assignment of error is overruled.

[6] Finally, defendant contends the trial judge acted arbitrarily and capriciously in sentencing him to life imprisonment for second degree murder. This assignment is overruled without discussion. The punishment is within statutory limits, G.S. 14-17 (1975 Cum. Supp.), and not inappropriate for the brutal, unprovoked murder and felonious assault disclosed by evidence which would have supported a verdict of murder in the first degree.

Prejudicial error in the trial not having been shown, the verdicts and judgments must be upheld.

No error.

Justice EXUM dissenting.

I dissent on the ground that defendant was not afforded a reasonable opportunity to inquire into and present evidence to support his contention that there was systematic exclusion of people of the black race from the petit jury that tried him. The majority recognizes the principle that such opportunity must be given when the defendant alleges such systematic exclusion. Its position is that since the jury panel for the week of court at which defendant was tried was selected some weeks before the trial began the defendant had an opportunity to develop such evidence as was available. He could have, the majority says, examined the names of the 60 jurors summoned for duty on the panel. I think the majority relies more on theory than reality. An examination of the 60 jurors summoned for duty could not have revealed which of those jurors would ultimately find their way into the courtroom to form the panel from which defendant had to select the petit trial jury. Obviously almost half of these names were somehow culled, or for some other reason did not appear for jury duty on the day defendant's case was called for trial. It was not until defendant arrived in the courtroom that he knew, or could have known, that the panel from which his petit jury was to be selected contained not a single member of his race. Faced with that circumstance I think defendant should have been entitled to inquire into the reasons and be given an opportunity to present evidence on the point he raised.

"Whether the defendant can establish the alleged racial discrimination or not, due process of law demands that he have his day in court on this matter, and such day he does not have, unless he has a reasonable opportunity and time to investigate and produce his evidence, if he has any." *State v. Perry*, 248 N.C. 334, 339, 103 S.E. 2d 404 (1958); *accord, State v. Inman*, 260 N.C. 311, 132 S.E. 2d 613 (1963). In both *Perry* and *Inman* new trials were granted under circumstances quite similar to those presented by defendant in this case.