STATE OF NORTH CAROLINA v. JAMES EARL NEWMAN AND STATE OF NORTH CAROLINA v. ROY LEE NEWMAN

No. 253A82

(Filed 3 May 1983)

1. **Criminal Law § 92.1— consolidation of charges against defendant and codefendant**

    The trial court's consolidation of kidnapping, robbery and rape charges against two defendants was not error where the offenses were perpetrated against the same person pursuant to a common scheme or plan with each of the defendants present and participating in each offense, and where the record did not disclose that the joinder in any way deprived either defendant of a fair trial or hindered his ability to present a defense. G.S. 15A-926(b).

2. **Rape and Allied Offenses § 5— sufficiency of evidence—unsupported testimony by victim**

    A conviction for rape may be based upon the unsupported testimony of the prosecuting witness.

3. **Rape and Allied Offenses § 5— guilt as aider and abettor—sufficiency of evidence**

    The State's evidence was sufficient to support defendant's conviction of first degree rape where it tended to show that the victim positively identified

defendant as one of the two men who abducted her from a grocery store park-ing lot; defendant and the codefendant forced the victim to go to a wooded area where defendant held a knife to her throat while the codefendant re-moved his trousers; and defendant then handed the knife to the codefendant, who used it to force the victim to submit to intercourse with him.

**4. Kidnapping § 1.2— removal to facilitate rape—sufficiency of evidence**

The State's evidence was sufficient to support conviction of defendant for kidnapping in violation of G.S. 14-39(a) where it tended to show that defendant and a codefendant abducted the victim from the parking lot of a grocery store; the victim was taken to a wooded area behind the store where she was raped by the codefendant; and the removal of the victim from the parking lot to the location where the rape occurred was not such asportation as was inherent in the commission of the crime of rape but was done for the purpose of facilitating the felony of rape.

**5. Criminal Law §§ 66.9, 66.18— in-court identification—failure to object—incor-rect date for pretrial identification**

Defendant waived his right to assert on appeal that the trial court er-roneously admitted a rape and kidnapping victim's in-court identification testimony where the record failed to show that defendant objected to the in-court identification, requested a voir dire hearing to determine whether the in-court identification was the product of an impermissibly suggestive pretrial procedure, or moved to strike the in-court identification testimony. Further-more, the fact that the victim incorrectly fixed the date when a pretrial photographic identification was made only affected the weight of her testi-mony and did not render improper the pretrial photographic procedure.

**6. Criminal Law §§ 42.2, 42.6— items connected with crime—chain of custody—no material change in condition**

The State established a sufficient chain of custody of grocery items taken from defendant's possession at the time of his arrest for the items to be ad-mitted into evidence where an officer tagged these items and put them into a police locker; the officer testified that he obtained the items from the police property room and brought them into the courtroom; and the officer identified these items as being the ones he tagged on the night of the incident in ques-tion. Moreover, such evidence was not inadmissible because there was no direct testimony tending to show that there was no material change in the con-dition of the items between the date of the alleged crime and the time of the trial since the absence of material change could be inferred from the nature of the items themselves and the positive identification of the items by the officer.

**7. Criminal Law § 42— grocery items—relevancy in kidnapping and rape case**

Where the evidence showed that when defendant was taken into custody shortly after a kidnapping and rape, he had in his possession grocery items which the victim testified she had bought shortly before she was abducted, the items were relevant to corroborate the victim's testimony as to her abduction and rape and also to strengthen her testimony identifying defendant as one of her assailants.

8. **Criminal Law § 89.7— impeachment of victim—past mental problems—no un-due restriction on cross-examination**

> Defendant was entitled to discredit a kidnapping and rape victim's testimony by attempting to show by cross-examination that she suffered from a mental impairment which affected her powers of observation, memory or narration, and evidence of past mental defects was admissible for this purpose. The trial court did not unduly limit defendant's cross-examination of the victim by excluding certain questions about her past mental problems where defendant was permitted to conduct a lengthy and in-depth cross-examination into the past mental condition of the victim, and the jury had ample opportunity to observe the victim's demeanor and hear her responses to the questions posed so as to form an opinion as to whether her powers of observation, memory and narration were then so impaired that she was not a credible witness.

APPEAL by defendants from *McLelland, J.,* at the 27 January 1982 Criminal Session of DURHAM Superior Court.

Defendants Roy Lee Newman and James Newman were charged in separate bills of indictment with armed robbery, kidnapping and first-degree rape. Both defendants entered pleas of not guilty to each charge. The cases were consolidated for trial over each defendant's objection.

At trial the State's evidence tended to show:

At about 11:00 o'clock p.m. on the night of 14 July 1981, Mrs. Georgia Mae Harris was leaving the Big Star grocery store at Wellons Shopping Center in Durham County where she had purchased several items including cake mix, canned cake frosting, dishwashing liquid, a can of motor oil, and shortening. After she had entered the parking lot, she was confronted by two men who told her they were escapees from "C.P." One of the men grabbed Mrs. Harris and she dropped her grocery bag and her billfold. The other man picked up the groceries and the wallet and the two men forced Mrs. Harris into a wooded area behind the Big Star store. During the time that she was being carried into the woods, Mrs. Harris felt an object she believed to be a knife pressed against her body. After they had entered the wooded area, one of the men, later identified as Roy Lee Newman, placed a knife to her throat while the other man, later identified as James Earl Newman, removed his pants. James Earl Newman then took the knife from Roy and Roy left the scene. The defendant James Earl Newman then had sexual intercourse with Mrs. Harris by force and against her will. He then told Mrs. Harris

that he wanted her to commit a crime against nature but Roy Lee Newman returned to the scene at that point and intervened on her behalf. Roy Lee Newman helped Mrs. Harris find her way back to the parking lot.

When Mrs. Harris and the Newmans neared the parking lot, she saw two men standing near the store and sought their help. At this point her assailants fled. The police were called and came to the scene where Mrs. Harris recounted the details of the assault and robbery, including a description of the two men. Shortly thereafter, the police officers saw two men matching the description given by Mrs. Harris. When the police confronted them, they managed to detain James Earl Newman who was carrying the grocery bag. Roy Lee Newman escaped. James Earl Newman was carried to the parking lot where Mrs. Harris identified him as one of her assailants. The bag which he was carrying contained items of the same type that Mrs. Harris had purchased from the Big Star grocery. Later on the same evening, Mrs. Harris picked James Earl Newman's photograph from a photographic array and at trial she made an in-court identification of James Earl Newman as the man who had raped her.

About one week later, Mrs. Harris observed a man on a downtown Durham street who she thought was her other assailant. He was accompanied by an older couple who the prosecuting witness knew to be a Mr. and Mrs. Newman. She immediately went to the police station and informed officers that she saw a man she believed to have been one of her assailants. Pursuant to this information, Detective Smith located Roy Lee Newman and obtained his consent to be photographed. His photograph was displayed to Mrs. Harris in a photographic array. She picked defendant Roy Lee Newman's photograph from the group as one of the men who abducted her from the Big Star parking lot and later assisted her from the woods back to the parking lot.

At trial the State introduced into evidence clothes worn by Mrs. Harris on the evening of 14 July 1981 and the items found in the grocery bag taken from James Newman on that night. No medical evidence was presented by the State. Neither defendant presented any evidence at trial.

At the close of the evidence the court granted defendants' motions to dismiss the charges of armed robbery. The court

denied defendants' motions to dismiss the kidnapping and first-degree rape charges.

The jury returned verdicts of guilty against each defendant on the charges of first-degree rape and kidnapping. Each defendant was sentenced to life imprisonment for first-degree rape and twelve years for kidnapping. Defendants appealed and on 22 September 1982 we allowed defendants' motions to bypass the Court of Appeals in the kidnapping cases.

*Rufus L. Edmisten, Attorney General, by Dennis P. Myers, Assistant Attorney General, for the State.*

*Henry D. Gamble, for defendant-appellant Roy Lee Newman.*

*Adam Stein, Appellate Defender, by Malcolm R. Hunter, Jr., Assistant Appellate Defender, for defendant-appellant James Earl Newman.*

BRANCH, Chief Justice.

## Appeal of Roy Lee Newman

[1]  Defendant, Roy Lee Newman, first assigns as error the action of the trial judge in consolidating his cases with those of James Earl Newman for trial.

G.S. 15A-926, in pertinent part, provides:

(b) Separate Pleadings for Each Defendant and Joinder of Defendants for Trial.—

   (1) Each defendant must be charged in a separate pleading.

   (2) Upon written motion of the prosecutor, charges against two or more defendants may be joined for trial:

   a. When each of the defendants is charged with accountability for each offense; or

   b. When, even if all of the defendants are not charged with accountability for each offense, the several offenses charged:

   1. Were part of a common scheme or plan; or

2. Were part of the same act or transaction; or

3. Were so closely connected in time, place, and occasion that it would be difficult to separate proof of one charge from proof of the others.

We first note that under the facts of this case the trial judge could have joined the offenses charged pursuant to any one or all of the provisions for joinder set out in G.S. 15A-926(b)(2). Further, the question of consolidation of offenses for trial is a matter which lies within the sound discretion of the trial judge, and his ruling will not be disturbed absent a showing that joinder would hinder or deprive defendant of his ability to present his defense. *State v. Greene*, 294 N.C. 418, 241 S.E. 2d 662 (1978); *State v. Braxton*, 294 N.C. 446, 242 S.E. 2d 769 (1978).

Here defendants were indicted for the same offenses, perpetrated against the same person pursuant to a common scheme or plan with each of the defendants present, and participating in each offense.

Defendant Roy Lee Newman contends that he was denied a fair trial by the joinder solely because the prosecuting witness erroneously identified Roy Lee Newman as James Earl Newman on more than one occasion. This argument is without merit. We find nothing in this record indicating that the witness erroneously identified Roy Lee Newman as James Newman. Even had there been a misidentification, such a discrepancy would go only to Mrs. Harris' credibility as a witness.

This record does not disclose that the joinder of the charged offenses amounted to an abuse of discretion on the part of Judge McLelland or that the joinder in any way deprived defendant of a fair trial or hindered his ability to present his defense.

Defendant next assigns as error the denial of his motion for nonsuit at the close of all the evidence. It is his position that because Mrs. Harris "made three or more contradictions in her testimony" the State was required to produce evidence to corroborate her testimony that she had been raped and kidnapped. Defendant cites no authority in support of this argument. In fact, the rule in North Carolina is that when ruling on a motion for judgment of nonsuit, the trial court is required to disregard any contradictions and inconsistencies in the evidence. *State v.*

*Witherspoon,* 293 N.C. 321, 237 S.E. 2d 822 (1977). In *Wither-spoon,* Justice Lake stated the often cited rule as follows:

> It is elementary that, upon a motion for judgment of non-suit in a criminal action, all of the evidence favorable to the State, whether competent or incompetent, must be considered, such evidence must be deemed true and considered in the light most favorable to the State, discrepancies and contradictions therein are disregarded and the State is entitled to every inference of fact which may be reasonably deduced therefrom.

*Id.* at 326, 237 S.E. 2d at 826. This assignment of error is overruled.

[2] Defendant also contends that the trial judge erred by denying his motion to set aside the verdict of guilty of first-degree rape. He asserts that the motion should have been allowed because there was no corroborative evidence to support the victim's testimony that she was raped. This argument is totally without merit. It is well settled in this jurisdiction that a conviction for rape may be based upon the unsupported testimony of the prosecuting witness. *State v. Denny,* 294 N.C. 294, 240 S.E. 2d 437 (1978); *State v. Shaw,* 284 N.C. 366, 200 S.E. 2d 585 (1973).

[3] Neither do we find any substance in defendant's position that the motion should have been allowed because the evidence does not show that he actually committed the rape. When two or more persons aid and abet each other in the commission of a crime, all being present, all are principals and equally guilty. *State v. Terry,* 278 N.C. 284, 179 S.E. 2d 368 (1971); *State v. Barrow,* 292 N.C. 227, 232 S.E. 2d 693 (1977).

Here the prosecuting witness positively identified Roy Lee Newman as one of the men who abducted her from the parking lot. She testified that he and James Earl Newman forced her to go to a wooded area where defendant Roy Lee Newman held a knife to her throat while James Earl Newman removed his trousers. Roy then handed the knife to James, who used it to force her to submit to intercourse with him. It is immaterial that Roy Lee Newman did not actually engage in intercourse with the victim.

Finally, we note that this motion was addressed to the discretion of the trial judge and his ruling will not be reviewed upon appeal absent a showing of an abuse of discretion. *State v. Hamm*, 299 N.C. 519, 263 S.E. 2d 556 (1980). No abuse of discretion is shown.

**[4]** Roy Lee Newman next assigns as error the denial of his motion to dismiss the charge of kidnapping. Relying upon the rationale of *State v. Dix*, 282 N.C. 490, 193 S.E. 2d 897 (1973) and *State v. Roberts*, 286 N.C. 265, 210 S.E. 2d 396 (1974), defendant contends that there was not sufficient asportation to make out a case of kidnapping.

In *Dix*, this Court held that there was not sufficient asportation to constitute the offense of kidnapping where the defendant by use of a gun forced a jailer to go from the front door of the jail to the jail cells, a distance of about 62 feet.

In *Roberts*, the defendant pulled a child a distance of about 80 or 90 feet apparently for the purpose of committing a sexual assault upon her. This Court reversed the defendant's conviction for kidnapping stating:

> Here, the entire incident occurred during the seconds it took defendant to pull Kathy a distance of 80 to 90 feet, . . . To constitute the crime of kidnapping the defendant (1) must have falsely imprisoned his victim by acquiring complete dominion and control over him for some appreciable period of time, and (2) must have carried him beyond the immediate vicinity of the place of such false imprisonment.

286 N.C. at 277, 210 S.E. 2d at 404.

Defendant's argument overlooks the fact that *Dix* and *Roberts* were decided before the 1975 General Assembly amended G.S. 14-39, the kidnapping statute. As amended, G.S. 14-39(a) now provides:

> (a) Any person who shall unlawfully confine, restrain, or remove from one place to another, any other person 16 years of age or over without the consent of such person, or any other person under the age of 16 years without the consent of a parent or legal custodian of such person, shall be guilty of kidnapping if such confinement, restraint or removal is for the purpose of:

(1) Holding such other person for ransom or as a hostage or using such other person as a shield; or

(2) Facilitating the commission of any felony or facilitating flight of any person following the commission of a felony; or

(3) Doing serious bodily harm to or terrorizing the person so confined, restrained or removed or any other person.

We considered the effect of this legislation in *State v. Fulcher*, 294 N.C. 503, 243 S.E. 2d 338 (1978). There we concluded:

It is equally clear that the Legislature rejected our determinations in *State v. Dix, supra*, and in *State v. Roberts, supra*, to the effect that, where the State relies upon asportation of the victim to estabish a kidnapping, the asportation must be for a substantial distance and where the State relies upon "dominion and control," i.e., "confinement" or "restraint," such must continue "for some appreciable period of time." Thus, it was clearly the intent of the Legislature to make resort to a tape measure or a stop watch unnecessary in determining whether the crime of kidnapping has been committed.

*Id.* at 522, 243 S.E. 2d at 351.

Subsequently, in *State v. Irwin*, 304 N.C. 93, 282 S.E. 2d 439 (1981), we considered the asportation element of kidnapping and construed the phrase in G.S. 14-39(a), "remove from one place to another," to require a removal separate and apart from that which is an inherent and inevitable part of the commission of another felony. *See also State v. Adams*, 299 N.C. 699, 264 S.E. 2d 46 (1980).

The facts in this case show that defendants abducted Mrs. Harris from the parking lot of the Big Star food store. She was taken to a wooded area behind the store. Removal of Mrs. Harris from her automobile to the location where the rape occurred was not such asportation as was inherent in the commission of the crime of rape. Rather, it was a separate course of conduct designed to remove her from the view of a passerby who might have hindered the commission of the crime. To this extent, the ac-

tion of removal was taken for the purpose of facilitating the felony of first-degree rape. Thus, defendant's conduct fell within the purview of G.S. 14-39 and the evidence was sufficient to sustain a conviction of kidnapping under that section. The trial judge properly denied defendant's motion to dismiss the charge of kidnapping.

[5] By assignment of error number 5, defendant contends that the trial judge erred by denying his motion to suppress the pretrial identification procedure in this case. He asserts that this procedure was so impermissibly suggestive that it tainted and rendered the prosecuting witness' in-court identification of defendant inadmissible. Initially, we note that the record before us does not show that defendant objected to the in-court identification, or requested a voir dire hearing to determine whether in-court identification was the product of an impermissibly suggestive pretrial procedure. Neither do we find a motion to strike the in-court identification testimony. Thus, defendant waived his right to assert on appeal that the trial court erroneously admitted the prosecuting witness' in-court identification testimony. *State v. Black*, 305 N.C. 614, 290 S.E. 2d 669 (1982); *State v. Brady*, 299 N.C. 547, 264 S.E. 2d 66 (1980).

Further, we find defendant's contention that the pretrial identification procedures were "improper" to be fruitless. He argues that since Mrs. Harris was unable to identify him at the pretrial proceeding evidence of the pretrial identification was inadmissible. In fact, the victim did identify defendant Roy Lee Newman in the pretrial proceedings. It is true that Mrs. Harris incorrectly fixed the date when this identification was made but this error would only affect the weight of her testimony as contradictions and discrepancies in identification testimony are for the jury to resolve. *See State v. Wilson*, 293 N.C. 47, 235 S.E. 2d 219 (1977).

The trial judge correctly admitted the pretrial and in-court identification testimony.

[6] Defendant Roy Lee Newman by his final assignment of error contends that the trial court erroneously admitted into evidence exhibit 1, certain items taken from defendant James Newman's possession at the time of his arrest. He argues that the State

failed to establish a sufficient chain of custody and that the items were not sufficiently identified.

Generally any object with a relevant connection to a criminal case is admissible into evidence. *State v. Sledge*, 297 N.C. 227, 254 S.E. 2d 579 (1979). However, if the object has a direct role in the circumstances giving rise to the trial, there must be testimony identifying the object as the same object involved in the incident and ordinarily there must be evidence tending to show that there has been no material change in the condition of the object between the time of the alleged crime and the trial. *State v. Harbison*, 293 N.C. 474, 238 S.E. 2d 449 (1977); *State v. Oliver*, 302 N.C. 28, 274 S.E. 2d 183 (1981). In instant case, Officer Smith testified that James Newman had certain grocery items in a bag at the time he was apprehended. The officer tagged these items and put them into a police locker. Detective Smith testified that he obtained the items in question from the police property room and brought them into the courtroom. Officer Morris identified these items as being the ones he tagged on the night of the incident in question.

This evidence was clearly sufficient to establish a proper chain of custody.

Neither do we find that the evidence was rendered inadmissible because there was no direct testimony tending to show that there was no material change in the condition of the items between the date of the alleged crime and the time of the trial.

In *State v. Oliver, supra,* the co-defendant Moore challenged the admissibility of two "football candies," a Robesonian newspaper, a plastic bag of paper money and food stamps, a blue coat with a fur lined collar, two toboggans, several pieces of multi-colored Christmas wrappings, a red pullover shirt with a hood, and a pistol and bullets on the grounds that the State failed to establish that these items had undergone no material change in their condition since the incident occurred. There was no direct evidence that the items had not undergone a change in condition.

Rejecting the defendant's contention, this Court, in pertinent part, stated:

> In the case at bar there is no evidence that the condition of any of the items in question had changed between the time

of their recovery on the day of the shootings and the time of trial. Indeed the very nature of the items themselves would make a change in condition extremely unlikely in the short time between the crimes' commission and the trial. All the items were positively identified as being the very items recovered by those investigating the incident in question. Considering the nature of the items themselves and the absence of any suggestion that they had undergone some relevant change between the time of their recovery and the time of trial, we conclude that the failure of the state to offer positive testimony that the objects had undergone no material change was not fatal to their admission. That they had in fact undergone no material change is clearly implied in the testimony of Sampson. His failure expressly to so state does not so detract from his otherwise positive identification of the items so as to render them inadmissible.

*Id.* at 53, 274 S.E. 2d at 199.

Here, as in *Oliver*, the absence of material change may be inferred from the nature of the items themselves and the positive identification of the items by Officer Morris.

[7] The only remaining question is whether these items had any relevance to an issue in this case.

When James Newman was taken into custody shortly after the attack upon Mrs. Harris, he had in his possession items which Mrs. Harris testified she had bought shortly before she was abducted. Therefore exhibit 1 was relevant in that it corroborated the prosecuting witness' testimony as to her abduction and rape and also tended to strengthen the identification testimony to the effect that James Newman was one of her assailants. The fact that Mrs. Harris admitted on cross-examination that she was not absolutely sure that one of the items contained in the challenged exhibit was one that she purchased does not render the exhibit inadmissible since the identification of relevant exhibits need not be absolute and unequivocal. *See State v. Bishop*, 293 N.C. 84, 235 S.E. 2d 214 (1977). This slight equivocation on the part of the witness Harris would relate only to the weight of her testimony. *See State v. Fikes*, 270 N.C. 780, 155 S.E. 2d 277 (1967).

We hold that the trial judge correctly admitted exhibit 1 into evidence.

### Appeal of James Earl Newman

[8]   James Earl Newman's sole assignment of error presents the question of whether the trial judge erred by limiting his cross-examination of the victim, Georgia Mae Harris. Defendant argues that the limitation on his cross-examination of Mrs. Harris as to her mental condition was particularly egregious since she was the principal witness in the identification process and the sole witness as to the actual commission of the crimes.

The portion of the cross-examination relevant to this assignment of error is as follows:

Q. Mrs. Harris, prior to your marriage were you known as Georgia Mae Green?

A. That was my maiden name.

Q. And what day were you born on?

A. December 11th, 1947.

Q. And is it not the case that you were involuntarily committed to the John Umstead Hospital in 1977?

A. That's—No, it was voluntarily. It wasn't involuntary.

Q. In fact, there had been three admissions to the John Umstead Hospital that you have had, isn't that correct, Mrs. Harris?

A. No, that is not correct. There have been—I was treated therapy and I was there on observation, because basically all of my life I had been a lively person and I knew that depression was sinking in and I wanted help.

Q. And you were not committed?

A. I had one commitment is what I'm saying. I had been committed once.

Q. Mrs. Harris, do you remember participating in a Court hearing on May of 1977?

A. Yes, I do.

Q. Is that the time that you say that you were involuntarily committed?

MR. SMITH: Objection.

THE COURT: Overruled. Answer the question.

A. This is when—This was when it was to be determined whether or not I was—should be further treated or whether I was to be released to go home. I was in the custody of the law. I had to have a hearing. That was for all patients. And it was determined at that time that I did not need to be committed.

Q. But you had been at the John Umstead Hospital in the eastern unit out there for a period of time prior to the actual hearing, isn't that the case?

A. That's right, a waiting period. I was supposed to wait there until my trial or hearing.

Q. And, in fact, the reason that you got to the John Umstead Hospital in the first place was because a person named Mary Green, who is your mother, filed a petition for an involuntary commitment with the Court in May of 1977, isn't that correct?

MR. SMITH: Objection.

THE COURT: Overruled.

A. My mother did do what you said.

Q. And isn't the fact the case that at the time that your mother took out that petition the reason was that you were walking around the City of Durham in a nightgown making praying motions, appearing to be a victim of amnesia and hallucinating and telling everyone that you were Jesus, isn't that right?

MR. SMITH: Objection.

THE COURT: Overruled. Witness will answer the question if she knows.

A. I don't remember all of that.

Q. And isn't in fact the case also that you were hearing voices of God and Angels at that time?

State v. Newman and State v. Newman

MR. SMITH: Objection.

THE COURT: Overruled. Answer the question.

A. I don't know that either.

Q. And isn't it also the case that you were examined by a physician at Duke Hospital prior to going to John Umstead Hospital at that time, isn't that true?

A. That is true.

Q. And at that time you told the physician that you were Jesus and that you had been to hell and back?

MR. SMITH: Objection.

THE COURT: Overruled. Answer it.

A. I don't remember that.

Q. And, in fact, you were psychotic at that time?

MR. SMITH: Objection.

J.E.N. Exception No. 1

THE COURT: Sustained.

Q. Is it not the case, Mrs. Harris, that the illness that you were treated for was for paranoia schizophrenia?

MR. SMITH: Objection.

J.E.N. Exception No. 2

THE COURT: Sustained.

Q. And is it also not the case that you received Thorazin—

MR. SMITH: Objection.

Q. — On that occasion?

J.E.N. Exception No. 3

THE COURT: Sustained.

Q. Have you ever taken the medication Thorazin, Mrs. Harris?

MR. SMITH: Objection.

THE COURT: Sustained.

Q. And isn't it a fact that in May of 1977, Judge Linwood Peoples entered an order committing you—

MR. SMITH: Objection.

Q. —To John Umstead Hospital for fourteen days on an involuntary basis?

MR. SMITH: Objection.

THE COURT: Overruled. The witness will answer the question if she knows.

A. Would you repeat your question, please?

Q. Isn't it in fact the case that in May of 1977, Judge Linwood Peoples in the District Court of Granville County entered an order committing you to John Umstead Hospital for fourteen days as an involuntary patient?

A. I never heard of the man.

Q. Now, Mrs. Harris, isn't it also the case that in January of 1978, a petition for involuntary commitment was served on you?

MR. SMITH: Objection.

A. January of '78—

MR. SMITH: I have an objection to it.

THE COURT: Objection is overruled.

Q. Is it not the case?

A. January of 1978?

Q. That's right.

A. What was your question?

Q. That a petition was served on you in January, 1978, for involuntary commitment under the name of Georgia Green?

A. At that time I was being—receiving therapy and counselling down at the Mental Health Center on Main Street.

State v. Newman and State v. Newman

Q. But it is in fact the case that your mother, Mary C. Green, filed a petition with the Clerk of Superior Court in Granville County on January 4th, 1978?

A. That's correct.

Q. And in that petition, wasn't that the reason in that petition that you weren't able to comprehend things. You were paranoid, and you were acting in a very depressed state of mind.

MR. SMITH: Objection.

THE COURT: Overruled.

A. All of that  was at my request. I had went to talk to my mother prior to all of this.

Q. And, in fact, when you were examined you claimed that by the physician at the time that petition was filed that you claimed that your boy friend controlled your thoughts and actions?

MR. SMITH: Objection.

THE COURT: Overruled. Answer the question.

A. I don't remember that.

Q. And further that you were examined—

MR. SMITH: Objection to the form of that question. Even with it's starting out with further—

Q. Let me ask also, Mrs.—

THE COURT: Overruled. Go ahead, please.

Q. —Harris, that on January 2nd, 1978, you were examined in the Emergency Room at Duke Hospital?

MR. SMITH: Objection, relevancy.

THE COURT: Overruled. Answer the question.

A. Yes.

Q. And that was in connection with this petition that was filed by your mother, isn't that right?

A. That's right.

Q. And at that time you told the physician that you had lost your penis and you had syphilis?

MR. SMITH: Objection.

THE COURT: Overruled. Answer the question.

A. I don't know anything about that.

Q. And isn't it the case that you were taken to Butner to John Umstead Hospital at the Eastern Unit?

A. That is a fact.

Q. And that you stayed there for a period of at least fourteen days, isn't that right?

A. I stayed there for a short period of time. I'm not sure of how many days.

Q. And is it also the case that you continued to take medication for your mental illness?

MR. SMITH: Objection.

THE COURT: Overruled. Answer that.

A. I've been taking medication since '78 and God.

On re-direct examination the State presented the following evidence:

Q. A few years ago you received some counselling and/or treatment for some emotional problems that you were having at the time, is that correct?

A. That's right.

Q. Where did you receive help from?

A. John Umstead Hospital and Durham Medical Community Health Center.

Q. Did you get help at first as a result of your own efforts or did somebody take you and lock you up and force you to seek some help?

A. The first initial move was made voluntarily.

State v. Newman and State v. Newman

Q. You thought you were becoming depressed and sought help for that?

A. Yes, sir. And I wasn't labeled as a—

Q. —We're not talking about what you were labeled.

A. I'm sorry.

Q. Did you receive help for problems that you were experiencing during that time?

A. Yes, sir.

Q. Do you remember what was causing some of the problems that you were having?

A. Yes.

Q. What were they?

A. At that time I was the only parent and I was a working mother and a student. There was a lot of pressure on me and there could have been any number of things. I was probably, after having talked with some of the people there they let me know that I had been a person that was basically shut up and kept things inside of me, balled up inside of me, through the years and I had never really confided in or had anyone to talk with.

Q. Were you able as a result of your interaction with the workers at the agencies that you mentioned able to open up?

A. Yes.

Q. Did you feel any relief as a result of the help that you received?

MS. PETERSEN: Objection.

THE COURT: Overruled. Answer it.

A. Very much so, yes, sir.

Q. When was the last time that you received some help for emotional problems or mental problems?

A. January of 1978.

Q. Have you been better able to handle the stress causing problems that you had before that time which led you to seek help in the first place?

A. Yes, sir.

Q. Have you continued to have any problems, emotionally, psychologically, mentally, since January, 1978?

A. No, sir.

Q. In July of 1981, were you experiencing any emotional, psychological or mental problems or pressures that effected your judgment in anyway similar to the way that you were feeling during the time in 1978, that you sought help for?

A. I was of sound mind.

Q. So you felt that the help that you got back in '77 or '78, during that time, was helpful to you?

A. Yes, sir.

Then, on recross-examination, counsel for defendant attempted to show that Mrs. Harris' characterization, during redirect examination, of the seriousness of her mental illness was inaccurate and in fact grossly understated the degree and kind of her mental illness:

Q. Now, going back to the—Mr. Smith asked you some questions about the mental situation. He asked you if you remembered in 1977, in the commitment proceeding in May of 1977, were you able to fill out the information concerning the appointment of counsel and sign the necessary forms that were offered to you by the Court?

MR. SMITH: Objection, relevancy.

J.E.N. Exception No. 4

THE COURT: Objection sustained.

Q. Let me ask also, have you ever been found by a Court to have been a paranoid schizophreniac?

MR. SMITH: Objection.

J.E.N. Exception No. 5

THE COURT: Objection sustained.

Q. Do you remember participating in a Court hearing before the Honorable Linwood Peoples?

MR. SMITH: Objection.

J.E.N. Exception No. 6

THE COURT: Sustained.

Q. At the time that you were committed you were at the Eastern Unit of the John Umstead Hospital, is that correct?

MR. SMITH: Objection.

J.E.N. Exception No. 7

THE COURT: Sustained.

Q. Let me ask that you look at this document in a Court proceeding file —

MR. SMITH: May I see it.

(Hands document to Mr. Smith.)

Q. Let me ask you if that is an order of involuntary commitment in the matter of Georgia Green?

MR. SMITH: Objection.

J.E.N. Exception No. 8

THE COURT: Sustained.

Q. I have no other questions.

Upon defense counsel's request, the trial court permitted cross-examination of Georgia Mae Harris in the absence of the jury. His purpose was to place answers in the record to questions which were sustained when she was examined before the jury. We quote:

Q. Mrs. Harris, I ask you again if in May of 1977, you were able to sign and fill out the information affidavit concerning appointment of counsel in a special proceeding which was filed for your involuntary commitment in May of 1977?

A. Could you rephrase that, please?

Q. There is a form that is in the Court file in a special proceeding in May of 1977 for the involuntary commitment of Georgia Green and I'm asking whether or not you were able to fill out the information form concerning whether or not you were entitled to an attorney and whether or not you were indigent at that time?

A. I did sign papers myself.

Q. Let me ask you if you would look at the form which is in the Court file in the matter of Georgia Green and ask if you see your signature on that paper which is headed information concerning appointment of counsel?

A. That's not my signature on it.

Q. Does it in fact say on the line which has responded which is Georgia Green that respondent is unable to sign form?

A. That's what's on there.

Q. I ask that you also look at this statement in reference to financial status questionnaire and ask if you signed that document in the same Court file?

A. My name is on here.

Q. And is it again, in fact, stated on here that the respondent was unable to give information or states unable to obtain information from respondent? Is that what is stated on that document?

A. That's what's on there.

Q. I would ask that you look at that Court order, the Court order that I showed you in the matter of Georgia Green 77 SP 421, and ask if you had ever been found by a Court to be paranoid schizophreniac?

A. I cannot answer that with a yes or a no.

Q. Let me direct your attention to the fact that this is the Court file involving you, Georgia Green, and ask if there is a paragraph in here that is checked by the Court, particularly the first paragraph of this Court Order has been checked, is that correct?

A. Yes, ma'am.

Q. And would you read that first paragraph?

A. The patient is mentally ill. What is that word, please?

Q. Inebriate.

A. Inebriate suffering with a mental disorder. Diagnosed as paranoid schizophrenia.

Q. And that, in fact, is in the Court order that has your name at the top of it, isn't that correct?

A. That's correct.

Q. Now, let me ask you also if there is a paragraph in there that says that you are unable to care for yourself at the present time?

A. That's correct.

Q. And is in fact that Court order dated May 18th, 1977?

A. Yes.

Q. And is it signed by Linwood Peoples, District Court Judge?

A. Yes, it is.

Q. And that is, in fact, the Court order involuntarily committing you to the John Umstead Hospital, is that correct?

A. Yes. I remember all of it, but I just don't know that Judge. You asked me if I know him and I just don't remember his name.

Q. That's all, your Honor.

The competency of a witness to testify by reason of mental incapacity is raised by a motion requesting the trial judge to pass on the witness' competency. The resolution of this question rests largely within the discretion of the trial judge. *State v. Benton,* 276 N.C. 641, 174 S.E. 2d 793 (1970); *State v. Robinson,* 283 N.C. 71, 194 S.E. 2d 811 (1973). Since defendant did not make such a motion, we assume defendant was satisfied as to the witness' *competency* to testify. It follows that his cross-examination of the

prosecuting witness was directed toward impugning her credibility. *See* 1 H. Brandis on North Carolina Evidence, *Witnesses*, § 44 (2d Rev. Ed. 1982); *Moyle v. Hopkins*, 222 N.C. 33, 21 S.E. 2d 826 (1942).

It is well settled that in a criminal case an accused is assured his right to cross-examine adverse witnesses by the constitutional guarantee of the right of confrontation. N.C. Const. art. I, § 23. *State v. Watson*, 281 N.C. 221, 188 S.E. 2d 289, *cert. denied*, 409 U.S. 1043, 93 S.Ct. 537, 34 L.Ed. 2d 493 (1972). *State v. Davis*, 294 N.C. 397, 241 S.E. 2d 656 (1978); 1 H. Brandis on North Carolina Evidence, *Witnesses*, § 35 (2d Rev. Ed. 1982). The range of relevant cross-examination is very broad, but it is subject to the discretionary powers of the trial judge to keep it within reasonable bounds. *State v. Miller*, 288 N.C. 582, 220 S.E. 2d 326 (1975); *State v. Royal*, 300 N.C. 515, 268 S.E. 2d 517 (1980).

We agree with defendant's contention that he was entitled to discredit the prosecuting witness' testimony by attempting to show by cross-examination that she suffered from a mental impairment which affected her powers of observation, memory or narration. 1 H. Brandis on North Carolina Evidence, *Witnesses*, § 44 (2d Rev. Ed. 1982). Evidence of past mental defects is admissible for this purpose. *Moyle v. Hopkins, supra; State v. Armstrong*, 232 N.C. 727, 62 S.E. 2d 50 (1950).

Defendant was permitted to conduct a lengthy and in-depth cross-examination into the past mental condition of the prosecuting witness. We are convinced that by this cross-examination the jury was made acutely aware of her prior mental problems. Additionally, the jury had ample opportunity to observe the prosecuting witness' demeanor and hear her responses to the questions posed so as to form an opinion as to whether her powers of observation, memory and narration were then so impaired that she was not a credible witness.

We hold that the trial judge did not unduly limit defendant James Newman's cross-examination of the prosecuting witness.

For the reasons set forth is this opinion, we hold that defendants Roy Lee Newman and James Earl Newman received a fair trial free of prejudicial error.

No error.