The appellant was convicted of embezzlement and sentenced to two years. Omitting the formal parts, the indictment charged:
 "GREGORY NEAL STEWART, alias . . . . whose name is to the Grand Jury otherwise unknown, the officer, agent, clerk, employee or servant of Spartan *Page 371 
Food Systems, Inc., a corporation did embezzle or fraudulently convert to his own use, or to the use of another, or did fraudulently secrete with intent to convert to his own use, or the use of another, money to about the amount of $2,100.00 and, of that value, which had come into his possession by virtue of his office, agency, employment or apprenticeship, against the peace and dignity of the State of Alabama."
On April 24, 1979, the appellant was employed by Spartan Food Systems, Inc., as an assistant manager of Hardee's in Montgomery, Alabama. Appellant's duties included operating the store, closing the business at night, and making a bank deposit at the close of his shift. On April 24, 1979, the deposit was unusually large due to the fact that Steve Graham, the assistant manager of the previous shift, had been unable to make a deposit. During the trial Graham testified that he was unable to make a deposit because the appellant, who was supposed to have prepared the deposit, was in the process of repairing a piece of equipment. Therefore, the proceeds that were to be deposited that night amounted to receipts from two shifts instead of just one. Graham recalled that the equipment appellant attempted to repair would not have prevented Hardee's operation if it had not been fixed that day.
Appellant stated that after closing the business that night, he entered his truck with the bank deposit, and someone stuck a gun in his face and told him to slide over in the truck. As appellant slid over to the passenger's side, the person drove him to a nearby area, blindfolded him, took the bank deposit and left. Minutes afterwards, the appellant allegedly drove back to Hardee's and called the police.
Montgomery Police Officers Ricky Mobley, J.T. Hankins and J.M. Duncan investigated the reported robbery. Mobley testified that, after appellant recounted the events of the robbery, he [Mobley] examined the truck and found that the cab was filled with an excessive amount of debris and personal items. Mobley stated that the position of the debris and other items on the seat was inconsistent with appellant's explanation of having slid across the seat. Appellant informed Mobley that the interior of the truck was then in the same condition as when he was robbed. A photograph of the truck's interior was properly admitted into evidence.
Mobley also obtained a written statement from the appellant, including the details of the alleged robbery and a description of the robber. Appellant stated, in pertinent part, that the alleged robber was white and wore black clothing with a black mask. Appellant said that after the robber left he did not hear a vehicle drive away. Mobley testified that the appellant did not name William McDaniel as the robber or give any indication of who he thought the robber was.
Detective Hankins testified that the appellant told him that the robber had used a towel to blindfold him. Hankins later removed a towel with a torn strip from the truck. Appellant did not state to Hankins that he suspected William McDaniel as the robber.
Detective Duncan stated that he talked to the appellant two days after the alleged robbery. At that time the appellant did not indicate who robbed him or mention the name of William McDaniel. The next day, Friday, April 27, the appellant came to see Detective Duncan and mentioned McDaniel's name then. After his conversation with the appellant on April 27, Duncan had a conversation with Detective Faye Henderson, and, as a result of that conversation, he again talked to the appellant. The appellant then revealed he had gone to McDaniel's home and talked to McDaniel about the robbery. The appellant said that McDaniel had taken him to a secluded area around Gunter Park to show him where the money taken during the robbery was buried. According to Duncan, he and the appellant then went to a heavily wooded area near Gunter Park and the appellant indicated a spot where McDaniel supposedly buried the money. Duncan did not observe any evidence of digging at the spot. *Page 372 
Faye Henderson, an investigator with the Montgomery Police Department, testified that she talked with the appellant on April 30, 1979, in the polygraph room. The appellant told her that, two or three days after the robbery, he went to William McDaniel's home and talked to him about the robbery. The appellant stated to Henderson that McDaniel had taken him to a wooded area on a dirt road where the money was supposedly buried.
Frank Head testified that on April 24, he was the manager of Hardee's where appellant was employed. On April 24, 1979, Mr. Head had two telephone conversations with the appellant, one prior to the alleged robbery and one after it occurred. During the first discussion, the appellant told Head that he had lost or misplaced the keys to the business, and that the afternoon deposit had not been made. Mr. Head told the appellant to place the deposit in a safe and he [Head] would take the deposit to the bank the following morning. Head explained that, without the keys to the business, the building could not be locked, and the night bank deposit box could not be opened. He testified that company policy required the manager making the night deposit to leave by way of the front door.
In the second conversation, the appellant informed Head of the alleged robbery. At that time the appellant told Mr. Head that he [appellant] had gone out the back door with the deposit and, in reply to Mr. Head's question concerning the loss of appellant's keys, the appellant stated that he had found them. After he arrived at Hardee's, Head determined that approximately $2,200.00 had been taken. He explained that it was company policy to make two deposits daily. The $2,200.00 deposit was about $1,500.00 or $1,600.00 more than it would have been had the earlier deposit been made.
Mr. Head recalled that, on the night of the alleged robbery, he told the appellant that Steve Graham, the day manager, would probably lose his job because he had failed to make the afternoon deposit. At that point, the appellant responded, "It's a shame, Steve will lose his job, I know where I can lay my hands on around two thousand dollars and maybe I can help Steve out."
Steve Graham testified that, as a result of his failure to make the deposit at Hardee's that day, he lost his job. At no time did the appellant ever offer to repay the money that Hardee's lost as a result of the alleged robbery.
Alice McDaniel, a sister of William McDaniel, was a part-time employee of Hardee's during the time of the alleged robbery. She testified that early one morning, two or three days after the robbery, the appellant came to her house and said he wanted to talk to her brother about opening a pinball business. Appellant talked to her brother and, after that conversation, the appellant and William McDaniel left the house and subsequently returned.
During cross-examination, she testified that she thought everyone in her family owned a black ski mask. She acknowledged that her brother had won some money in a poker game, and that he had been charged with an offense relating to the robbery at Hardee's.
Mike Vance testified that he was appellant's former roommate. On the morning after the alleged robbery at Hardee's he had a conversation with the appellant. At that time, the appellant told Vance that two men robbed him, blindfolded him, and drove him in his truck to the old Selma Highway. The appellant said that an hour later he returned to Hardee's and called the police.
Vance recalled a second conversation wherein the appellant stated to Vance that Billy McDaniel owed the appellant a thousand dollars. The appellant said he had loaned McDaniel money for a pinball venture.
Vance had a third conversation with the appellant in which the appellant told Vance that if he [Vance] did not help him "cover up what he has done or just totally be quiet, that I [Vance] will be hurt." Vance stated that, on December 25, he was stabbed in the hand by a person whom he had seen before, but whom he did not know by name. At *Page 373 
the time Vance was stabbed, the person told him that he "wanted to get me back for what I did for Greg Stewart, to Greg Stewart in Montgomery."
Victor Vance was the father of Mike Vance. He stated that, about a week after the alleged robbery, the appellant told him that two men robbed, bound, and then drove him outside of town.
At the completion of Mr. Vance's testimony, the State rested its case and the appellant made a motion to exclude the evidence based on the fact that the State had failed to present sufficient evidence. The motion was denied and the appellant took the stand in his own behalf.
Appellant testified that, on April 24, 1979, he had been employed at Hardee's for about five months. He stated that, when he closed the business at 10:00 P.M. he was robbed by a person dressed in black and wearing a black mask. Further, he said that, after the robbery, he was driven to a housing section known as Carol Villa, blindfolded and left in his truck. After the robbery he immediately drove back to Hardee's to call the police.
The appellant said he suspected William McDaniel of the alleged robbery. He testified that he learned from Alice McDaniel that her brother, William, had borrowed a ski mask from a younger brother, and that he had recently paid several debts. According to the appellant, three or four days after the offense, he visited Willaim McDaniel at his home and McDaniel confessed to the alleged robbery. The appellant later testified, however, that he only "suspected" McDaniel of the robbery. Appellant stated that he had gone to Gunter Industrial Park in search of the money alone, and was later accompanied by McDaniel. He stated that McDaniel said he had placed the money in a plastic bag and buried it under some water, but, when they went to the location where the money was supposedly buried, they could not find it. The appellant also said that he had accompanied Detective Duncan to look for the money, but they could not find it either.
The appellant testified that the photograph introduced by the State did not accurately depict the interior of the truck as it was on the night of the robbery. He indicated that the police had been inside the cab of the truck prior to the picture's being taken. He acknowledged that he had offered to help Steve Graham, and that he had talked to McDaniel, but he stated that his conversation with McDaniel involved the opening of a pinball arcade on the Atlanta Highway. He denied the conversation with Mike Vance, but admitted that he knew Vance had testified before the grand jury.
During cross-examination, the appellant admitted the contents of the written statements given to Detective Mobley. He denied that during the robbery he slid over to the passenger's side of the truck as Detective Mobley had indicated. He stated that he saw Detective Duncan on the same day that he met with McDaniel, and he determined that the date was Saturday, April 28.
At the end of appellant's testimony, the State recalled Detective Duncan who testified that he did not work on Saturday April 28. Duncan said that he doubted the appellant could have talked to McDaniel on Friday, April 27, because appellant was in jail on an unrelated matter at that time.
 I
Appellant complains that his written motions for a continuance, based on the absence of William McDaniel, a material witness, were improperly denied by the trial court. He argues that McDaniel was indicted as a co-conspirator and had given the appellant certain information which could exonerate him.
The granting of a motion for a continuance in a criminal trial is addressed to the discretion of the trial court, and, unless that discretion is clearly shown to have been abused, it will not be disturbed on appeal. Fletcher v. State, 291 Ala. 67, 277 So.2d 882; Wilson v. State, Ala.Cr.App.,384 So.2d 1243, 6 Ala. Digest Criminal Law 586, 7 Ala. Digest Criminal Law 1151. *Page 374 
The record clearly indicates that the appellant did not subpoena William McDaniel until the Thursday before the appellant's Tuesday trial date. Also, we note that no showing was made concerning what McDaniel's testimony would have been. Therefore, it is our judgment that the trial court acted properly in denying the motions for continuance.
 II
The appellant contends that the trial court committed reversible error when it admitted into evidence a statement made by the appellant without a showing that he had been given his Miranda rights. He argues that, although no objection was made to the introduction of the statement, its admission should constitute plain error.
Since no objection was made to the admission of the statement, no question for review is preserved. Gunn v. State, Ala.Cr.App.,387 So.2d 280. No "plain error rule" exists in Alabama except for capital punishment cases. See Jacobs v. State, Ala.,371 So.2d 448; Rule 39 (k), A.R.A.P.
We note that, at the time the appellant made the statement complained of, he was not a suspect or in custody for the crime. At the time of their discussions with the appellant, the police were under the impression that appellant was the victim. The officers took his statement at that time as part of their investigation of the offense. No Miranda warnings were necessary under these circumstances. Miranda v. Arizona,384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694; Harris v. State, Ala.Cr.App., 376 So.2d 773; Blackburn v. State, Ala.Cr.App.,372 So.2d 908.
 III
The appellant maintains that the trial court erred when it admitted testimony concerning a polygraph test and denied his motion for a mistrial.
The record contains two references to a polygraph. One occurred when Detective Henderson stated that she had talked to the appellant "in the polygraph room." Appellant objected and moved for a mistrial; the trial court overruled both the objection and the motion. The other reference came during the testimony of Victor Vance, when the witness said that he and appellant had discussed the polygraph test that appellant had taken. The appellant made a general objection and the court did not rule on that objection, but it did instruct the witness not to mention the polygraph test. Appellant did not request a ruling or object to the trial court's failure to rule on his objection.
We recognize the general rule in Alabama to be that the results of polygraph or lie detector tests are not admissible.Flurry v. State, 52 Ala. App. 64, 289 So.2d 632; Wilcutt v.State, 41 Ala. App. 25, 123 So.2d 193. We do not believe, however, that the first reference to a polygraph violated this rule. The instance merely related to the location of the appellant's conversation with Detective Henderson, and did not reveal that appellant had taken a lie detector test or disclose its results.
In the second instance, in the absence of a ruling, a request for a ruling, or an objection the court's failure to rule, there is nothing preserved for appellate review. Margro v.State, Ala.Cr.App., 384 So.2d 871; Cook v. State, Ala.Cr.App.,369 So.2d 1243.
 IV
Appellant insists that the trial court erred when it allowed a portion of Mike Vance's testimony tending to show the execution of appellant's threat to Vance by a third party. Vance had stated that in August appellant told him that "if I [Vance] don't some way help him [appellant] cover up what he had done or just totally be quiet that I will be hurt." Appellant objected to Vance's further testimony that on December 25 Vance was stabbed by an unknown assailant who said he "wanted to get me back for what I did for Greg Stewart, to Greg Stewart in Montgomery."
Following a hearing outside the presence of the jury on the admissibility of the foregoing testimony, the trial court ruled that *Page 375 
the attacker's statement would be admitted under the res gestae exception to the hearsay rule. Appellant asserts that the fulfillment of a threat made four and one-half months earlier cannot be considered a part of the res gestae.
Initially, we note that conduct involving the intimidation of a witness or the suppression of evidence is admissible without regard to the time of its occurrence or its being part of the res gestae. See Williams v. State, Ala.Cr.App., 354 So.2d 48, cert. den. 354 So.2d 53 (Ala. 1978); Montgomery v. State,17 Ala. App. 469, 86 So. 132, cert. den. 204 Ala. 389, 85 So. 785
(1920). In Montgomery v. State, supra, the court stated:
 "Any act proving, or tending to prove, an effort or a desire on the part of the defendant to obliterate evidence of a crime, is always relevant, for from such facts, if unexplained, the jury may justly apprehend [the defendant's] mental condition, and may infer that they indicate a consciousness of guilt. . . . Evidence upon this theory never depends on its contemporaneousness, connection with the crime that is charged, or upon its being a part of the res gestae. Facts showing or tending to show a consciousness of guilt are always permissible, though not connected with the res gestae of the offense." [Emphasis added].
The rule of Montgomery v. State, supra, applies to a defendant's act which is deemed to be an implied admission of conduct. See Gamble, McElroy's Alabama Evidence, § 190.02 (1977). When the execution of a threat or the attempt to suppress evidence is done by a third party, then it must be shown that the defendant "offered, procured, promoted or approved such attempt." Gamble, McElroy's Alabama Evidence, § 190.03; see Sims v. State, 146 Ala. 109, 41 So. 413 (1906) (evidence that defendant's father tried to bribe witness not admissible unless father's action is linked to defendant).
The facts of the case under review convince us that it was shown that appellant "offered, procured, promoted or approved" the act of Vance's assailant. Appellant himself threatened Vance; four and one-half months later Vance was attacked by one who announced, in substance, that the stabbing was done for appellant. In Wigmore on Evidence, § 105 (3rd ed. 1940) we find the following:
 "When one threatens to do an injury to another, and that or a similar injury afterwards happens, this furnishes ground to presume that he who threatened the fact was the perpetrator or instigator." (quoting Swift, Evidence, at p. 136 (1810).
A fact may be proved by circumstantial evidence as well as direct evidence, and the former is entitled to the same weight as the latter. Mains v. State, Ala.Cr.App., 375 So.2d 1299. We believe that the circumstantial evidence tending to connect appellant with Vance's stabbing was sufficient to support a finding that the attack was accomplished with appellant's knowledge or approval. See Williams v. State, supra. We therefore find no error in the trial court's admission of Vance's testimony.
 V
Appellant contends that he was denied the right to impeach Mike Vance concerning Vance's prior mental illness and to cross-examine him regarding his appearance before the grand jury in order to prove a prior inconsistent statement.
As to the former, the credibility of a witness may be attacked by showing mental incapacity, but only if the incapacity exists at the time the witness testifies, or existed at the time of his observation of the incident about which he testifies. Garrett v. State, 268 Ala. 299, 105 So.2d 541
(1958); See Cannon v. State, 53 Ala. App. 509, 301 So.2d 272
(1974).
As to the latter instance, appellant's inquiry regarding Mike Vance's grand jury testimony did not focus upon those questions necessary for impeachment by use of a prior inconsistent statement. Rather, it was directed toward whether Vance, at the time of his grand jury appearance, had *Page 376 
retained counsel and had been given his Miranda warnings. Both inquiries were irrelevant to the issue of a claimed prior inconsistent statement. After the trial court sustained the State's objection to appellant's questions, the appellant ceased his examination of the witness. He did not inquire further into the matter, or attempt to lay a proper predicate for impeachment by a prior inconsistent statement. We find no error in the trial court's ruling in this regard.
 VI
We have examined the evidence in this case and find it sufficient to present a prima facie case of embezzlement. Therefore, the trial court properly overruled appellant's motion to exclude the State's evidence. See Hill v. State,48 Ala. App. 240, 263 So.2d 696; § 13-3-20, Code of Alabama 1975; 8 Alabama Digest Embezzlement 1, 44 (1). See also, Cumbo v.State, Ala.Cr.App., 368 So.2d 871.
We have examined the record and transcript of evidence and find no error prejudicial to the appellant. Therefore, the judgment of conviction by the Montgomery Circuit Court is affirmed.
AFFIRMED.
All the Judges concur.