STATE OF NORTH CAROLINA v. WAVERLY WILLIAMS

No. 384A91

(Filed 27 January 1992)

1. **Evidence and Witnesses § 3023 (NCI4th)— impeachment of witness—drug habit, suicide attempts, psychiatric history— Rule 608(b) inapplicable**

    Rule of Evidence 608(b), which governs the admissibility of evidence of specific instances of conduct bearing on truthfulness or untruthfulness, does not govern the admissibility of evidence of the drug habit, suicide attempts and psychiatric history of the State's chief witness in a first degree murder case.

    **Am Jur 2d, Witnesses §§ 540, 546, 563.**

2. **Evidence and Witnesses §§ 2947, 2948 (NCI4th)— State's chief witness—impeachment—drug habit, suicide attempts, psychiatric history**

    The trial court erred in precluding defendant from cross-examining the State's chief witness in this first degree murder trial about his chronic drug habit, suicide attempts and psychiatric history because this evidence was admissible under Rule of Evidence 611(b) to impeach the witness's ability to perceive, retain, or narrate even though the suicide attempts and psychiatric counselling occurred more than two years prior to the victim's death. Furthermore, defendant was prejudiced

STATE v. WILLIAMS

[330 N.C. 711 (1992)]

by the exclusion of this evidence where the testimony of this witness was the only evidence directly linking defendant to the murder, and impeachment of the witness was particularly critical in light of the testimony of defendant's witnesses that contradicted this witness's estimation of the time of the victim's death and his claim that defendant was with him when the victim was killed.

**Am Jur 2d, Witnesses §§ 540, 546.**

**Cross-examination of witness as to his mental state or condition, to impeach competency or credibility. 44 ALR3d 1203.**

APPEAL of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by *Hobgood, J.*, at the 7 May 1990 Criminal Session of Superior Court, VANCE County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 12 December 1991.

*Lacy H. Thornburg, Attorney General, by Valerie B. Spalding, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Daniel R. Pollitt, Assistant Appellate Defender, for defendant appellant.*

WHICHARD, Justice.

Defendant was tried on an indictment charging him with the first-degree murder of Marcelleta (Marcie) Youlande Williams. In a noncapital trial, the jury returned a verdict of guilty and the trial court sentenced defendant to life imprisonment.

Defendant and the victim, Marcie Williams, were first cousins and members of a close family, some members of which lived in New York City and some in Henderson, North Carolina. In the fall of 1988, defendant occupied a room in the trailer of his and Marcie's mutual aunt, Sharon Williams, in Henderson. When Marcie graduated from college in December 1988, defendant moved out of the room and into the home of another aunt, Carolyn Williams, and Marcie moved into the trailer of Sharon Williams. On the afternoon of 19 January 1989, Marcie was found shot to death in the living room of the trailer. She sustained a shot to the top of her head and a patterned bruise on her face and forehead, consistent with an impact from ridged boots.

**STATE v. WILLIAMS**

[330 N.C. 711 (1992)]

Defendant was arrested for first-degree murder two months later. At trial, the State's case rested almost exclusively on the testimony of William Carroll, who was also charged with the murder. Carroll testified for the State pursuant to an agreement under which he received a ten-year sentence in return for pleading guilty to second-degree murder and testifying against defendant. At trial, Carroll admitted that he was afraid of serving a life sentence and had heard that ten years can mean less in actual time served. According to Carroll, he witnessed a fight between defendant and Marcie over some cocaine about 9:30 a.m. on the day of the murder, which resulted in defendant's shooting Marcie in the head with Carroll's father's shotgun.

While defendant presented alibi witnesses, his main defense strategy was to impeach Carroll's credibility with evidence that, among other things, Carroll had a drug habit, had attempted suicide twice, and had received psychiatric counselling as a result. Specifically, defendant sought to impeach Carroll by cross-examining him about two suicide attempts in 1987. On voir dire, defendant elicited testimony from Carroll that he first attempted suicide in January 1987 by taking an overdose of Hydroxin and Vistaril. In June 1987, Carroll attempted suicide a second time by pouring rubbing alcohol on himself and setting himself on fire, sustaining second-degree and third-degree burns. As a result of the suicide attempts, Carroll received psychiatric counselling for a period of two or three months. At the time of the attempts, Carroll was depressed because of personal problems and problems with some teachers in his high school, one of whom he had assaulted. Also at the time, and through 1989, Carroll regularly smoked marijuana and cocaine.

While the trial court allowed defendant to inquire about Carroll's drug use on the day of the crime, it precluded him from cross-examining Carroll about his suicide attempts, psychiatric history, and drug habit. Defendant argues that as a result he was precluded from pursuing his main defense. The court based its ruling on Rule 608(b), which governs admissibility of evidence of specific instances of conduct bearing on truthfulness or untruthfulness. We hold that the trial court erred in excluding this evidence because it was admissible impeachment evidence under Rule 611(b). We further conclude that the error was prejudicial and award defendant a new trial.

Carroll testified as follows:

STATE v. WILLIAMS

[330 N.C. 711 (1992)]

He first saw defendant at Carolyn Williams' house on the morning of 19 January around 8:00 a.m. When Carroll asked defendant where he wanted to go, defendant asked him for a gun. Carroll responded that he did not have his gun, but he offered to, and did, secure his father's shotgun. Defendant then asked him to drive him to Marcie's residence so he could attend to some business. They arrived at the trailer around 9:00 a.m.

At first, Carroll stayed in the car at defendant's request. Marcie answered the door. Ten minutes later, defendant asked Carroll to come inside, and he did. He sat on a couch with Marcie. Defendant then came from the back of the trailer with the gun. When Carroll asked him what was going on, defendant responded, "When somebody fucks me, I fuck 'em back." Defendant demanded his cocaine and his money, and Marcie stood up and began to scream. Defendant pointed the gun at Carroll and told him to silence Marcie, whereupon Carroll grabbed her and fell to the floor with her. While they were on the floor, with Carroll's head only six inches from Marcie's, defendant kicked Marcie in the face with his boots, hit her with the butt of the gun, and shot her in the head.

The two men then went to the home of Carroll's father to return the gun. On the way, defendant told Carroll only he and Carroll knew about the incident, so defendant would know the source of any rumors. Once there, defendant gave Carroll a bag of cocaine and asked him to sell it and bring defendant the money. Carroll originally told the officers he was not successful in selling the cocaine, so he threw it in the sewer.

Both men then went to Carolyn Williams' house, where they remained for about an hour. They then went to another relative's house to try to sell the cocaine. Next, they returned to the home of Carroll's father, where defendant asked Carroll to obtain $130—enough, defendant said, for two bus tickets. Carroll went to Revco Warehouse, his mother's place of work, seeking the money, but she did not give it to him. That afternoon, while defendant and Carroll were together at Carolyn Williams' home, another relative called to say that Marcie had been shot. Carroll took a bus to New York two days later because he was afraid of defendant.

The State presented no other evidence, physical or otherwise, which placed defendant at the scene of the crime at the time of the murder. The remainder of the State's case consisted of testimony

of the officers who questioned Carroll and investigated the crime scene, and corroborative testimony by Carroll's attorney.

On cross-examination of Carroll, defendant elicited the following testimony:

On 15 March 1989, officers questioned Carroll for over five hours. For the first three hours Carroll maintained that he had nothing to do with the murder. After the officers indicated they did not believe his story, Carroll advised them that while he did not kill Marcie, he was present and knew who did kill her. He also was willing to "turn State's witness," saying that he had not been telling the truth but that he would tell them the whole truth. Carroll then gave a statement, less detailed than his testimony at trial, implicating himself and defendant.

Carroll met with officers again on 6 November 1989 in the presence of his attorney and the district attorney. He then added details, such as defendant's kicking Marcie in the face before shooting her, which he did not relate in his initial statement. In his original statement, he had said he was with defendant throughout the day of the murder, but in the 6 November interview he mentioned for the first time that he left defendant around noon to ask his mother for money. While Carroll originally told the officers he had thrown the cocaine from the trailer into the sewer, at trial he admitted that he sold it for $200 in order to buy the bus ticket to New York. Although in his first statement Carroll described restraining Marcie at defendant's instruction, at trial he mentioned for the first time that his head was only six inches from Marcie's when defendant brought the gun down on her head and shot her.

Defendant also elicited evidence that Carroll had prior convictions for resisting an officer and injuring real property, that following these convictions Carroll was directed to seek help from the Vance County Mental Health Clinic, and that Carroll smoked marijuana cigarettes laced with cocaine once or twice a week on or about 19 January 1989.

Three relatives of defendant and Marcie testified about defendant's and Marcie's whereabouts on the day of the murder. The first, Sharon Williams, testified that Marcie was still alive when Sharon left the trailer at 10:00 a.m.—a half hour later than the time of death according to Carroll's testimony—to go to work. At about 7:00 a.m., someone driving a blue car had knocked on

the, door, but Sharon was still in bed and Marcie did not open the door. Sharon learned of Marcie's death at about 1:00 p.m. when a neighbor called her at work.

The second witness, Carolyn Williams, testified that after waking at 7:00 a.m. on the day of Marcie's death to ready her youngest son for school, she woke defendant, who had slept on the sofa in her den. At 9:00 a.m., defendant and Carroll, who was present, helped Carolyn load laundry into the car and Carolyn left for the laundromat, first dropping off Carroll on the corner near his home. Carolyn returned with the clean laundry around 11:00 or 11:30 a.m. and found defendant and her older sons at home and still asleep. After waking them and talking with them for about a half hour, she left to run errands with and for her mother, returning at 1:30 p.m. to prepare for work at 2:00 p.m. Both times Carolyn returned home, defendant and her sons were present, but Carroll was not. Defendant went with Carolyn's son Kevin to take her to work at 2:00 p.m., and at 3:00 p.m. she received a call about Marcie. Carolyn then joined family members, including defendant, at the trailer park.

Defendant's third witness, Kevin Williams, adult son of Carolyn Williams, testified that he saw Carroll on 19 January around 3:00 a.m. in the den of his mother's house. Carroll was dressed in his work clothes and ridged work boots. After going to bed late, Kevin awoke at 11:30 a.m. to help his mother bring in the laundry, then went back to sleep until 1:30 p.m. Kevin saw defendant at both 11:30 a.m. and 1:30 p.m. At 2:00 p.m., he and defendant drove Carolyn Williams to work, drove their grandmother home, and then returned to the house, where they received the call about the discovery of Marcie's body. According to Kevin, defendant was very upset and cried about the news. Kevin and defendant left for the trailer, dropping Carroll off first. Carroll said, "It's a family thing." At the trailer defendant continued to cry and hit a girl who was laughing and "being smart." Officers told Kevin to take defendant away from the scene. Kevin was aware that defendant later was convicted of assault as a result of the incident, and that defendant performed community service as a sentence.

Although defendant presented these alibi witnesses, his main defense strategy was to impeach Carroll. The trial court allowed him to ask both Carolyn and Kevin Williams about Carroll's reputation for truthfulness. Carolyn answered that he "fantasized," and

Kevin answered that "he lied quite a bit." Defendant also presented testimony from Carroll's mother, Barbara Carroll, that her son came alone to her on 19 January while she was on her lunch break to ask her for $160, explaining that "he needed to get away."

In a further effort to impeach Carroll, defendant presented the testimony of Robert Benge, who was in the cell next to Carroll's while Carroll was being held in connection with Marcie's murder. Benge testified that Carroll told him he alone murdered Marcie while he was on drugs that affected his mind, but that he was going to turn State's witness against a cousin of Marcie's because the cousin knew he had killed Marcie and because he wanted to lessen his sentence. The State impeached Benge by eliciting evidence that Benge had corresponded with and conducted an interview with defendant's attorneys.

Marcie's mother, Melissa Williams Norwell, testified for defendant at his bond hearing in March 1989. She had known defendant all his life, had helped rear him, knew him well, and did not believe he had murdered her only child. Immediately following the murder, Ms. Norwell had gone to North Carolina, but she returned to New York in the middle of February. In March, she read in the paper that William Carroll had accused defendant of being the murderer. Upon learning of this, Ms. Norwell told defendant, who had returned to his home in New York, and defendant was shocked and puzzled as to why Carroll would lie in this way.

The day Ms. Norwell and defendant learned of the accusation, they took a bus to North Carolina to straighten out the matter, knowing that defendant would be met with a warrant for his arrest. Although the bus stopped in both Washington and Richmond, and although defendant had money with him, Ms. Norwell testified that he never gave any indication of turning back or leaving her company. A sheriff's deputy met Ms. Norwell and defendant at the Henderson bus station.

[1]  At trial the State argued, and the trial court agreed, that Rule 608(b) governed the admission of evidence about Carroll's drug habit, his suicide attempts, and his psychiatric history. As a result, the State and the trial court believed that *State v. Morgan,* 315 N.C. 626, 340 S.E.2d 84 (1986), controlled. In *Morgan,* the Court set out the factors that determine when Rule 608(b) applies and when it allows the admission of evidence of specific instances of conduct:

Rule 608(b) addresses the admissibility of specific instances of conduct (as opposed to opinion or reputation evidence) only in the very narrow instance where (1) the *purpose* of producing the evidence is to impeach or enhance credibility by proving that the witness' conduct indicates his character for truthfulness or untruthfulness; and (2) the conduct in question *is in fact probative* of truthfulness or untruthfulness and is not too remote in time; and (3) the conduct in question did *not result in a conviction*; and (4) the inquiry into the conduct *takes place during cross-examination.*

*Id.* at 634, 340 S.E.2d at 89-90.

The State argues that because evidence of Carroll's drug habit and mental problems is not probative of truthfulness, it cannot come in under Rule 608(b). It further argues that this evidence is inadmissible because it fails to meet the requirement of close temporal proximity, given the passage of two years between Carroll's suicide attempts and counselling and Marcie's murder. It argues still further that the trial court did permit defendant to cross-examine Carroll about his drug use during the pertinent period—on or around the date of the murder.

The State also relies on language in *Morgan* that "evidence routinely disapproved as irrelevant to the question of a witness' general veracity [under Rule 608(b)] . . . includes specific instances of conduct relating to 'sexual relationships or proclivities, the bearing of illigitimate [sic] children, the use of drugs or alcohol . . . or *violence against other persons.*'" *Id.* at 635, 340 S.E.2d at 90 (quoting 3 David Louisell & Christopher B. Mueller, *Federal Evidence* § 305 (1979) [hereinafter *Federal Evidence*] ). *Accord State v. Finch,* 293 N.C. 132, 142-43, 235 S.E.2d 819, 825 (1977); *State v. Rowland,* 89 N.C. App. 372, 382, 366 S.E.2d 550, 555 (1988).

The State is correct that evidence of drug use alone is not admissible under Rule 608(b). In *State v. Clark,* 324 N.C. 146, 377 S.E.2d 54 (1988), we held that the trial court erred when it failed to sustain the defendant's objection to a question about her use of marijuana. The purpose of the question was to undermine her testimony about her claims of abuse by a first, drug-addicted husband, and a second, alcoholic husband. The Court held that the "defendant's admission to having smoked marijuana had no conceivable tendency to prove or disprove her truthfulness." *Id.* at 167, 377 S.E.2d at 67.

STATE v. WILLIAMS

[330 N.C. 711 (1992)]

**[2]** While the State and the trial court correctly set out the law regarding Rule 608(b), that rule does not govern this case. Instead, Rule 611(b) governs. It states: "A witness may be cross-examined on any matter relevant to any issue in the case, *including credibility*." N.C.G.S. § 8C-1, Rule 611(b) (1988) (emphasis added). While the language of the rule alone does not clearly illuminate the issue here, the case law and treatises interpreting it establish that evidence of Carroll's drug use, his suicide attempts, and his psychiatric history is proper and admissible for purposes of impeachment. "There is no rule of evidence which provides that testimony admissible for one purpose and inadmissible for another purpose is thereby rendered inadmissible; quite the contrary is the case." *United States v. Abel*, 469 U.S. 45, 56, 83 L. Ed. 2d 450, 460 (1984).

While specific instances of drug use or mental instability are not directly probative of truthfulness, they may bear upon credibility in other ways, such as to "cast doubt upon the capacity of a witness to observe, recollect, and recount, and if so they are properly the subject not only of cross-examination but of extrinsic evidence . . . ." 3 *Federal Evidence* § 305, at 236. While evidence of addiction

> seems too far removed from veracity to be [a] permissible subject[ ] for cross-examination under Rule 608 as proof that the witness is by disposition untruthful, it is far less clear that such evidence should be excluded on the question of the credit to be given the witness, when viewed as a reflection on his ability to observe, retain, and narrate.

*Id.* § 342, at 489-90. Rule 608 does not apply because mental, psychological, or emotional defects "reflect on *mental capacity* for truth-telling rather than on *moral inducements* for truth-telling . . . ." 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* § 607(04), at 607-55 (1991) (emphasis added).

While no North Carolina cases specifically discuss application of Rules 608(b) and 611(b) in this context, pre-Rules cases concede the admissibility of evidence of mental defects or instability, suicide attempts, and drug or alcohol addiction for the purpose of discrediting a witness' testimony due to impairment of the ability to observe, retain, or narrate. *See, e.g., State v. Newman*, 308 N.C. 231, 254, 302 S.E.2d 174, 187 (1983) (evidence of past mental defects); *State v. Armstrong*, 232 N.C. 727, 728, 62 S.E.2d 50, 51 (1950) (evidence of mental retardation and impairment); *Moyle v. Hopkins*, 222 N.C.

33, 34, 21 S.E.2d 826, 827 (1942) (evidence of mental retardation); *State v. Harrelson*, 54 N.C. App. 349, 350, 283 S.E.2d 168, 170 (1981), *disc. rev. denied*, 305 N.C. 154, 289 S.E.2d 381 (1982) (evidence of mental illness); *State v. Parker*, 45 N.C. App. 276, 278, 262 S.E.2d 686, 688 (1980) (evidence of past psychiatric treatment); *State v. Wright*, 29 N.C. App. 752, 753, 225 S.E.2d 645, 646 (1976) (evidence of psychiatric history); *see also State v. Fields*, 315 N.C. 191, 204, 337 S.E.2d 518, 526 (1985) (effect of drug use is more properly a question of credibility than of competency); *State v. Looney*, 294 N.C. 1, 21, 240 S.E.2d 612, 624 (1978) (discussing New Jersey case, Court recognized that evidence of alcoholism and commitments to institutions on that account is proper for impeachment, but viewed refusal to allow defense request for order directing involuntary psychiatric examination of a witness as "an entirely different matter"); *State v. Conrad*, 275 N.C. 342, 349, 168 S.E.2d 39, 44 (1969) (assumes witness' "attempt at suicide conceivably might have some relevancy as to her mental balance and her recollection sufficient to be impeaching" while holding that "chance remark that the judge failed to see relevancy [did] not amount to prejudicial error"); *State v. Poolos*, 241 N.C. 382, 383, 85 S.E.2d 342, 343 (1955) (State's witness asked if she had once attempted suicide by eating bobby pins; Court thought "the question . . . a permissible one for the purpose of impeaching the credibility of the testimony of the witness," but held ruling excluding answer not prejudicial because what reply would have been not in record); *State v. Jones*, 64 N.C. App. 505, 509, 307 S.E.2d 823, 826 (1983) (evidence accomplice drunk at time of crime does not make his testimony inherently incredible; rather, credibility is for the jury); *State v. Edwards*, 37 N.C. App. 47, 49, 245 S.E.2d 527, 528 (1978) (evidence of drug use goes to credibility, not competency). The State acknowledges this extensive case law, but contends that most of these cases involved evidence that the witness was suffering from a mental defect either at the time of observing the events or at the time of testifying at trial. Evidence of the type in question, it argues, is therefore only admissible if the defendant can show that the witness' ability to perceive, recollect, or narrate was affected by the mental impairment.

It is true that some of the above cases involved a mental defect present at the time of the events witnessed. *Fields*, 315 N.C. at 203-04, 337 S.E.2d at 525-26; *Jones*, 64 N.C. App. at 509, 307 S.E.2d at 826; *Edwards*, 37 N.C. App. at 49, 245 S.E.2d at 528. *Parker* addressed the admissibility of evidence that the defend-

ant had undergone a psychiatric examination just before trial in order to determine his competency. *Parker*, 45 N.C. App. at 278, 262 S.E.2d at 688. In *Edwards*, although the issue was one of competency rather than credibility, the Court of Appeals reasoned that

> evidence that the witness was using drugs, either when testifying or when the events to which he testified occurred, is properly admitted only for purposes of impeachment and only to the extent that such drug use may affect the ability of the witness to accurately observe or describe details of the events which he has seen.

*Edwards*, 37 N.C. App. at 49, 245 S.E.2d at 528.

Some courts have limited admission of evidence that a witness suffers from mental illness or addiction to cases where the illness or addiction actually affected the mental capacity of the witness at the time of commission of the crime or testimony at trial. Federal: *United States v. Sampol*, 636 F.2d 621, 667 (D.C. Cir. 1980); *United States v. Leonard*, 494 F.2d 955, 971 (D.C. Cir. 1974). State: Alabama—*Stewart v. State*, 398 So. 2d 369, 375 (Ala. Crim. App.), *writ denied, Ex parte Stewart*, 398 So. 2d 376 (Ala. 1981); Arizona—*State v. Johnson*, 106 Ariz. 539, 540-41, 479 P.2d 424, 426 (1971); California—*People v. Smith*, 4 Cal. App. 3d 403, 412, 84 Cal. Rptr. 412, 418 (1970); Florida—*Edwards v. State*, 548 So. 2d 656, 658 (Fla. 1989); Illinois—*People v. Helton*, 153 Ill. App. 3d 726, 734, 506 N.E.2d 307, 311-12 (1987); Massachusetts—*Commonwealth v. Carrion*, 407 Mass. 263, 273-74, 552 N.E.2d 558, 565 (1990); Tennessee—*State v. Barnes*, 703 S.W.2d 611, 617-18 (Tenn. 1985), *cert. denied*, 476 U.S. 1153, 90 L. Ed. 2d 705 (1986). In this jurisdiction, however, we have allowed juries to evaluate not only the effect of mental defects, but also of the passage of time, on a witness' ability to perceive, retain, and recount. Most recently, we held that a defendant was entitled to discredit the prosecuting witness' testimony by cross-examining her about her past mental problems and treatment in the years 1977-78, even though the events about which the witness testified occurred in July 1981 and the trial occurred in January 1982. *State v. Newman*, 308 N.C. at 243-54, 302 S.E.2d at 182-88. That cross-examination included some twenty detailed questions about the witness' involuntary commitments in May 1977 and January 1978 and the nature of her hallucinations. In contrast, the trial court here precluded all questions about Carroll's suicide attempts, his psychiatric treat-

ment, and his chronic drug abuse, with the effect of largely depriving defendant of his major defense.

In both *Newman* and here, the mental problems about which the defendants sought to cross-examine the witnesses occurred some period of time prior to either the crimes witnessed or the trials. *Newman* involved a three- to four-year gap, even longer than the two-year gap in the case at bar. In *Conrad,* the Court granted that a key prosecution witness' suicide attempt two years before the witness testified was conceivably proper impeachment evidence. *Conrad,* 275 N.C. at 349, 168 S.E.2d at 44.

We are not alone in allowing admission of evidence of mental defects and chronic substance abuse despite a time gap between the problem, the events testified to, and the trial. In a case in which the details the defendants sought to elicit occurred up to ten years before the trial, the Eleventh Circuit held that a trial court erred by limiting the scope of the defendants' cross-examination of a key State witness and insider to mail fraud. *United States v. Lindstrom,* 698 F.2d 1154 (11th Cir. 1983). The court so held even though the trial court allowed the defendants to question the witness about her commitments for mental illness in 1971, 1978, and 1981, and about her suicide attempts in 1971 and 1978. Given that the witness was the chief prosecution witness, that she initiated and pursued the investigation against the defendants, and that the defendants' defense was that she did these things as part of a vendetta against them, the court held that the defendants were entitled to question the witness as well about her certified history of violent, manipulative, and vindictive acts and her diagnoses as suicidal, homicidal, and delusional. *Id.* at 1163.

Other cases in which courts have held that evidence of mental defects and/or substance abuse—at times other than when the witness observed the offense or testified at trial—is admissible to impeach a witness' ability to perceive, retain, or narrate, include the following: Federal: *United States v. Partin,* 493 F.2d 750, 763-64 (5th Cir. 1974). State: Illinois—*People v. Crump,* 5 Ill. 2d 251, 261-62, 125 N.E.2d 615, 621 (1955); *People v. DiMaso,* 100 Ill. App. 3d 338, 342, 426 N.E.2d 972, 975 (1981); Maryland—*Reese v. State,* 54 Md. App. 281, 290-92, 458 A.2d 492, 497-98 (1983); Minnesota—*State v. Hawkins,* 260 N.W.2d 150, 158 (Minn. 1977); Mississippi—*Walley v. State,* 240 Miss. 136, 138, 126 So. 2d 534, 535 (1961); Ohio—*State v. Browning,* 98 Ohio App. 8, 14, 128 N.E.2d 173, 176

(1954). While none of these cases impose a time limitation on the admission of the impeachment evidence, nearly all reveal a concern for the potential of witness harassment and prejudice to the parties. As a result, nearly all impose, either expressly or by implication, some form of restraint on the use of evidence that a witness has suffered or suffers from mental illness or addiction or alcoholism. The most common restraint or limiting factor is that the witness must be a crucial witness for the prosecution. All the North Carolina cases involved cross-examination of key State witnesses. *See State v. Newman*, 308 N.C. at 254, 302 S.E.2d at 187 (prosecuting witness in a rape and kidnapping case); *State v. Conrad*, 275 N.C. at 349, 168 S.E.2d at 44 (State witness who strongly implicated both defendants in the conspiracy and substantive charge); *State v. Poolos*, 241 N.C. at 383, 85 S.E.2d at 343 (State witness in prosecution for prostitution); *State v. Wright*, 29 N.C. App. at 753, 225 S.E.2d at 646 (State's only eyewitness). All the federal and state cases cited also featured key prosecution witnesses—either prosecuting witnesses, accomplices, or addict-informers. *Cf. State v. Barnes*, 703 S.W.2d at 617-18 (evidence of witness' psychiatric history admissible for impeachment; must be a key prosecution witness and evidence of the mental instability must be shown to have existed within a reasonable time of the event observed or of the testimony). Some cases further note the weakness of the prosecution's case without the testimony of these important witnesses. *Hawkins*, 260 N.W.2d at 158; *Walley*, 240 Miss. at 138, 126 So. 2d at 535.

Where, as here, the witness in question is a key witness for the State, this jurisdiction has long allowed cross-examination regarding the witness' past mental problems or defects. As stated by Chief Justice Stacy: "The denial of any impeachment [as to mental defects] of the State's only eye-witness to the fatal assault necessitates another hearing. It is always open to a defendant to challenge the credibility of the witnesses offered by the prosecution against him." *State v. Armstrong*, 232 N.C. 727, 728, 62 S.E.2d 50, 51 (1950). It is beyond dispute that Carroll's testimony here was essential to the State's case. No other evidence linked defendant directly to the murder.

The evidence of Carroll's troubled past was considerable, including two suicide attempts, one of a particularly bizarre nature which necessitated psychiatric treatment, and a history of chronic abuse of marijuana and cocaine. Because Carroll's testimony was the State's sole direct evidence on the ultimate issue, his credibility

took on enhanced importance. *See Browning*, 98 Ohio App. at 14, 128 N.E.2d at 176. Further, impeachment was particularly critical in light of the testimony of defendant's witnesses that contradicted both Carroll's estimation of the time of Marcie's death and his claim that defendant was with him in the trailer when Marcie was killed. The testimony of these three witnesses, all of equal relation to defendant and Marcie, squarely placed Carroll's credibility in question, while the State offered no explanation as to why these witnesses would express a greater loyalty to defendant than to Marcie. The fact that defendant was allowed to elicit reputation evidence that Carroll "lied" or "fantasized" does not decrease the moment of the evidence the trial court excluded. Had the more detailed and concrete evidence of the whole of Carroll's disturbed past, consisting of suicide attempts, psychiatric treatment, and chronic drug abuse been before the jury, it may well have evaluated Carroll's credibility and his testimony to the State's detriment.

For the reasons stated, the trial court erred in not allowing defendant to cross-examine Carroll about his suicide attempts, psychiatric history, and drug habit. Because Carroll's credibility was critical to the State's case, we cannot conclude that the error was harmless. Accordingly, we award a new trial.

New trial.