IN THE SUPREME COURT OF NORTH CAROLINA

No. 23A24

Filed 21 March 2025

STATE OF NORTH CAROLINA

v.

KENDRICK KEYANTI GREGORY

Appeal pursuant to N.C.G.S. § 7A-30(2) (2023) from the decision of a divided panel of the Court of Appeals, 291 N.C. App. 617 (2023), finding no error after appeal from judgments entered on 4 August 2021 by Judge Thomas H. Lock in Superior Court, Wake County. Heard in the Supreme Court on 18 February 2025.

*Jeff Jackson, Attorney General, by Zachary K. Dunn, Special Deputy Attorney General, for the State-appellee.*

*Kellie Mannette for defendant-appellant.*

PER CURIAM.

AFFIRMED.

Justice RIGGS dissenting.

In the case at bar, the trial court limited, in a significant way, defendant Mr. Kendrick Gregory's cross-examination of the State's expert. Mr. Gregory was on trial for a series of terrible crimes, and the only issue at the trial was whether his significant mental illness could warrant a jury's conclusion that he lacked legal culpability because of that illness. Questioning the credibility of the State's expert witness—the only expert opining that Mr. Gregory was not legally insane at the time of the crime—was central to Mr. Gregory's defense. "Even a partial restraint" on a defendant's "right to cross-examine a witness" on a subject matter relevant to the witness's credibility can "be an abuse of discretion and a violation of [the] constitutional right[ ]" to confront witnesses. *State v. Legette*, 292 N.C. 44, 53 (1977) (cleaned up). Because the trial court excluded cross-examination material that was highly probative of the expert witness's credibility, limiting the cross-examination in this case was an abuse of discretion and a violation of Mr. Gregory's constitutional right to confront the witnesses against him. For that reason, I respectfully dissent.

Mr. Gregory does not dispute the facts of his crimes; the sole issue in his trial was whether his mental illness at the time he committed the crimes rose to the level of impeding his criminal culpability. On 30 August 2015, Mr. Gregory, at just twenty years old, went on a violent crime spree. For the eighteen months leading up to these events, it is undisputed that Mr. Gregory was struggling with the onset of

schizoaffective disorder, a severe mental illness that tends to develop in males in their late teens. With only a limited support system, Mr. Gregory attempted to admit himself to psychiatric care facilities on *twenty* separate occasions in the eight months prior to his crimes. He presented at these facilities complaining of suicidal ideations and auditory hallucinations commanding him to kill himself and others. And for six weeks prior to these crimes, Mr. Gregory was not taking antipsychotic medication to treat his schizoaffective disorder.

Mr. Gregory's challenges in coping with his severe mental health illness were certainly amplified by a troubled childhood. Mr. Gregory grew up in a family that frequently moved around and, at times, experienced homelessness and food insecurity. From the age of seven until he was fifteen, Mr. Gregory was raised by a stepfather who routinely abused him. This chaotic family life disrupted Mr. Gregory's education and he eventually dropped out of school in ninth grade. Around this time, he turned to substance abuse, likely to self-medicate.

After Mr. Gregory's arrest in September 2015, even the State struggled to manage Mr. Gregory's mental illness in jail. In early 2016, the Wake County Detention Center asked the trial court to transfer Mr. Gregory to the Department of Correction for safekeeping because the jail was unable to handle Mr. Gregory's mental health problems. On two separate occasions after the commission of the crimes, Mr. Gregory was found incompetent to proceed to trial due to his severe mental illness. Dr. Nicole Wolfe, a forensic psychiatrist at Central Regional Hospital,

evaluated Mr. Gregory's capacity to proceed to trial in 2017 and 2019. On both occasions, she expressed her opinion that Mr. Gregory's severe mental illness, including psychosis, schizophrenia, and mania, rendered him incompetent to proceed to trial.

In 2020, the State petitioned the court to order forced medication to restore Mr. Gregory's capacity to stand trial for the 2015 crimes. *See Sell v. United States*, 539 U.S. 166, 180–81 (2003) (holding that a trial court may require involuntary administration of drugs if it is necessary to further an important governmental interest and the only means of rendering the defendant competent to stand trial). At a *Sell* hearing, the State must proffer a medical expert to (1) demonstrate that forced medication is the only way the defendant's competency for trial can be restored, and (2) that the proposed plan is medically appropriate. *Id.* at 181. The State must provide clear and convincing evidence that the State interest outweighs the defendant's liberty interest. *United States v. Bush*, 585 F.3d 806, 814 (4th Cir. 2009) (collecting cases as to the clear and convincing standard for *Sell* hearings).

Dr. Wolfe was one of two witnesses to testify for the State at the *Sell* hearing. Dr. Wolfe testified that she did "not believe that [Mr. Gregory] would regain capacity without antipsychotic medication." In her view, Mr. Gregory was "not going to spontaneously improve without treatment." Further, she highlighted that "there are significant risks with lack of treatment, and psychotic people do unpredictable actions, and sometimes that's dangerous[ ] to [themselves] or others." "[U]ntreated

psychosis can lead to suicide, not uncommonly, and it can also lead to aggression."

At the *Sell* hearing, the State's other witness was Dr. Brandon Harsch, an expert in forensic psychiatry. He testified about the diagnosis of schizophrenia and schizoaffective disorder in general and the treatments for these illnesses. He testified about the policies at Central Regional Hospital for involuntarily medicating noncompliant patients.

Dr. Harsch testified about his experiences and interactions with Mr. Gregory and his review of Mr. Gregory's medical records. At the time of the hearing, he and Dr. Wolfe possessed and reviewed medical records from eight of Mr. Gregory's admissions to Holly Hill Hospital in the eight months prior to the crimes. He also testified about the process and level of medication required to restore Mr. Gregory's capacity in late 2017 and into early 2018. Dr. Harsch acknowledged during the *Sell* hearing that, on occasion, Mr. Gregory would malinger, meaning he would exaggerate his symptoms for personal gain.

Still, during Dr. Wolfe's testimony, she did not mention any malingering or feigning of symptoms on Mr. Gregory's part. Instead, she painted a picture of a severely mentally ill man who could only be restored to capacity to stand trial through regular treatment of high-dose antipsychotic medication.

At the trial, in 2021 (one year after the *Sell* hearing), the sole issue was whether Mr. Gregory's untreated mental disorder, schizoaffective disorder, prevented him from understanding the nature and quality of his actions when he committed the

crimes at issue. *See State v. Jones*, 293 N.C. 413, 425 (1977) (explaining the standard for not guilty by reason of insanity as a person "incapable of knowing the nature and quality of the act, or, if he does know this, was, by reason of such defect of reason, incapable of distinguishing between right and wrong in relation to such act"). Mr. Gregory presented two expert witnesses who testified about his severe schizoaffective disorder. Both experts described Mr. Gregory's presentation of schizoaffective disorder as causing hallucinations, delusional thinking, and disorganized or catatonic behavior alongside depression, mania, bipolar, and other mood disorders. Both concluded that he was not able to discern right from wrong when it came to his actions. The sole witness who testified that Mr. Gregory had the capacity to understand the quality and nature of his actions and to distinguish between right and wrong was Dr. Wolfe.

At trial, Dr. Wolfe painted a very different picture of Mr. Gregory than she had at the *Sell* hearing. Dr. Wolfe described Mr. Gregory as a manipulative and cunning man who feigned symptoms of mental illness to get meals and a place to sleep. To Dr. Wolfe, the medical records from the months leading up to the crimes that, in the context of a *Sell* hearing, demonstrated the severity of Mr. Gregory's illness, now represented evidence that Mr. Gregory was feigning symptoms and malingering for housing and bus tickets. Dr. Wolfe characterized the same symptoms— hallucinations, suicidal ideation, and illogical responses—differently at trial than she characterized them at the *Sell* hearing. During the *Sell* hearing, the symptoms

supported her conclusion that he suffered from schizoaffective disorder bipolar type, requiring forced medication. But at trial, these same symptoms were so severe that they had to be false.

Dr. Wolfe acknowledged that in her 2018 evaluation of Mr. Gregory's mental state at the time of the crimes, she noted "significant concern that [Mr. Gregory's] psychiatric condition w[ould] decompensate" without antipsychotic medication. However, she emphasized her opinion that Mr. Gregory's medical records establish a "pretty consistent pattern that Mr. Gregory is . . . endorsing symptoms when it serves him." Ultimately, Dr. Wolfe concluded that "Mr. Gregory's mental illness did not prevent him from understanding the nature and quality or wrongfulness of his actions" when he committed the crimes.

On cross-examination, the defense tried to question Dr. Wolfe about the purpose of her testimony in the *Sell* hearing. The trial court sustained the State's objection and limited the defense's cross-examination of Dr. Wolfe about the reason for the *Sell* hearing. In other words, the defense could not let the jury know that the purpose of her testimony during the *Sell* hearing was to enable the State to forcibly medicate Mr. Gregory to restore his competency for trial. While the defense could cross-examine Dr. Wolfe about her testimony at the *Sell* hearing, the jury could not know the purpose of that hearing and make an informed assessment regarding the motivation behind Dr. Wolfe's seemingly inconsistent opinions.

"The right to confront and cross-examine one's accusers is central to an

effective defense and a fair trial." *Legette*, 292 N.C. at 53 (citing *Greene v. McElroy*, 360 U.S. 474 (1959)). In a criminal case, "every circumstance that is calculated to throw any light upon the supposed crime is admissible." *State v. Sneeden*, 274 N.C. 498, 502 (1968) (quoting *State v. Hamilton*, 264 N.C. 277, 286 (1965)). For that reason, "our courts have allowed wide latitude in admitting evidence having a tendency to throw light upon the mental condition of a defendant who has entered a plea of not guilty by reason of insanity." *State v. Bundridge*, 294 N.C. 45, 51 (1978). Cross-examination explores "possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand." *Davis v. Alaska*, 415 U.S. 308, 316 (1974). Our rules of evidence permit the broadest possible scope for cross-examination of expert witnesses to test the value of their testimony. *See State v. Bacon*, 337 N.C. 66, 88 (1994) ("The largest possible scope should be given, and almost any question may be put to test the value of his testimony." (cleaned up)). The jury's evaluation of a witness's truthfulness and reliability often turns on subtle factors such as the witness's motivation in testifying. *See, e.g.*, *Napue v. Illinois*, 360 U.S. 264, 269 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying . . . that a defendant's life or liberty may depend.").

Our rules of evidence and a defendant's constitutional right to confront witnesses allow a defendant to fully explore a vast array of bases on which a jury can

assess the credibility and motives of a witness. *See Bacon*, 337 N.C. at 88 (permitting cross-examination of an expert witness "to obtain further details with regard to his testimony on direct examination, to impeach the witness or attack his credibility, or to elicit new and different evidence relevant to the case as a whole"). The significance of cross-examining a witness's credibility is particularly important where, like here, a single witness constitutes "the State's sole direct evidence on the ultimate issue." *State v. Whaley*, 362 N.C. 156, 161 (2008) (quoting *State v. Williams*, 330 N.C. 711, 723–24 (1992)).

While it is true that the standard for assessing competency to stand trial is different than the standard for assessing legal insanity, the jury must have all relevant information to assess the credibility and motivations of an expert witness. *See Bundridge*, 294 N.C. at 49–50 (recognizing that the test for capacity to stand trial, which is "capacity to comprehend his position, to understand the nature of the proceedings against him, to conduct his defense in a rational manner and to cooperate with his counsel so that any available defense may be interposed," differs from the standard for a plea of not guilty by reason of insanity in which the defendant cannot "distinguish between right and wrong at the time of and in respect to the matter of investigation"). Because of the trial court's ruling, the jury here was not privy to the motivation behind Dr. Wolfe's testimony at the *Sell* hearing—to provide an expert opinion that the *only* way Mr. Gregory would have the capacity to stand trial was if he was forcibly medicated with antipsychotic medication. At the *Sell* hearing, Dr.

Wolfe testified it was "very clear" that Mr. Gregory's psychotic symptoms were "representative of genuine mental illness" and not just an exaggerated state. Only a year later, she testified that his hallucination symptoms were not consistent with schizophrenia and his records demonstrated a "strong pattern of manipulative, deceitful behavior." A reasonable juror could conclude that the differences in Dr. Wolfe's testimony in these different contexts (*Sell* hearing versus trial) undermined her credibility at trial.

At trial, Dr. Wolfe explained that the variation in her testimony was based on her receipt of additional medical records she received after she testified at the prior hearing. However, the defense should have been allowed to explore whether the purpose of the *Sell* hearing—persuading a court to allow forcible medication for the purpose of bringing a defendant to trial—factored into the change in her opinion or whether her decision to proffer that testimony undermined her credibility at trial. Put another way, the fact that she previously testified with the intent of facilitating the State's forcible medication of Mr. Gregory without reviewing all of his relevant medical records could have led the jury to question her reliability as an expert witness.

The trial court relied upon Rule 403 of the Rules of Evidence to support its decision to preclude any reference to the State's desire to forcibly medicate Mr. Gregory so he could stand trial for his crimes. *See* N.C.G.S. § 8C-1, Rule 403 (2023) ("Although relevant, evidence may be excluded if its probative value is substantially

outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. . . ."). However, the trial court did not explain why the probative value of the *Sell* hearing's purpose was "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." The Court of Appeals decision, which the majority summarily affirms, presumed that any probative value of *Dr. Wolfe's motivation* for testifying at the *Sell* hearing was substantially outweighed by its *unfair* prejudicial effect. *See State v. Gregory*, 291 N.C. App. 617, 628–29 (2023). In its brief to this Court, the State offers that "any mention of the State attempting to forcibly medicate [Mr. Gregory] likely would have played on the jury's emotions and been viewed by the jury as the State improperly medicating [Mr. Gregory] against his will." Such an explanation is as troubling as it is incredible.

Unfair prejudice in the context of Rule 403 means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, as an emotional one." *State v. DeLeonardo*, 315 N.C. 762, 772 (1986) (cleaned up). As a primary matter, the jury was already aware that the state hospital had forcibly medicated Mr. Gregory under its policy for involuntary medication of aggressive or violent patients. But more centrally, in a trial with only one issue—whether Mr. Gregory was incapable of knowing the nature and quality of the criminal act or distinguishing between right and wrong in relation to his crime—Dr. Wolfe was the only witness testifying he was legally sane at the time of the crimes. *See Jones*, 293 N.C. at 425 (explaining the standard for not guilty by reason of insanity). There exists

a mechanism by which the State can forcibly medicate a criminal defendant to render him mentally healthy enough to stand trial. The State cannot pretend that a mechanism of which it avails itself is somehow so emotionally troubling to a jury that the State and the court have to pretend that such a mechanism does not exist. And if the State is proffering a medical expert at a *Sell* hearing for the purpose of forcibly medicating a criminal defendant and that expert alters his or her opinion, our rules of evidence and constitution require that the defense be allowed to raise questions about that expert's credibility and intentions.

Fundamental fairness dictates that the jury should appreciate the complete picture of Dr. Wolfe's evaluations of Mr. Gregory as the jury considered her credibility. In this scenario, any prejudice stemming from the State's desire to forcibly medicate Mr. Gregory in order for him to stand trial was outweighed by the probative value of the jury's full understanding of the *Sell* hearing in relation to Dr. Wolfe's credibility.

A violation of a "defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless." N.C.G.S. § 15A-1443(b) (2023). In contrast, an error relating to rights arising other than under the Constitution of the United States is prejudicial "when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial." N.C.G.S.

§ 15A-1443(a).   Under either standard, the limitation on the defense's cross-examination of Dr. Wolfe prejudiced Mr. Gregory.

The record easily supports this conclusion.  The jury deliberated on the only question in this case—whether Mr. Gregory met the standard for legal insanity—for a day and a half and struggled to reach a unanimous decision about whether Mr. Gregory was "incapable of knowing the nature and quality of the act, or, if he does know this, was, by reason of such defect of reason, incapable of distinguishing between right and wrong in relation to such act." *See Jones*, 293 N.C. at 425.  During its deliberations, the jury asked for the trial court to define the phrase "nature and quality" and explain how "nature and quality" affects whether a defendant can distinguish between right and wrong.  In response to these two questions, the trial court reinstructed the jury on the definition of not guilty by reason of insanity. Several hours after being told to use the ordinary meaning of "nature and quality," the jury asked: "Can we have a dictionary definition of 'nature and quality' as it pertains to the law?"  The court and attorneys spent several hours researching the question and ultimately told the jury that "for a person to understand the nature and quality of his act means that the person must have sufficient mental capacity to know and understand what he is doing at the time he is doing it."  Several hours later, the jury reported that it was hung.  After being told to resume deliberation, the jury then finally found Mr. Gregory guilty of the charges.

We cannot know what the jury discussed over the course of nearly two days

while it deliberated about the nature and quality of the act and whether Mr. Gregory could distinguish between right and wrong. But what we know—and the jury did not know—is that Dr. Wolfe testified that Mr. Gregory's "capacity was contingent on medication," and she suggested the State use the mechanism of a *Sell* hearing to forcibly medicate him because of the severity of his mental illness. Neither side disputes that in the six weeks leading to these crimes, Mr. Gregory's schizoaffective disorder was untreated. "Who knows, however, how much evidence it takes to persuade a jury?" *Bundridge*, 294 N.C. at 59 (Exum, J., dissenting). In a case that can be distilled down to a battle of expert witnesses, there is a reasonable possibility that the motivation for Dr. Wolfe's testimony at the *Sell* hearing, had it been offered, would have led the jury to a different result. *See* N.C.G.S. § 15A-1443(a).

The Confrontation Clause protects the right to cross-examine a witness, and cross-examination, amongst other things, tests the credibility of that witness. *Davis*, 415 U.S. at 315–16. "[E]xposure of a witness'[s] motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Id.* at 316–17. To exclude the important context of Dr. Wolfe's motivation for testifying at the *Sell* hearing was an abuse of discretion and a violation of Mr. Gregory's constitutional right to confront the witness testifying against him.

Justice EARLS joins in this dissenting opinion.